Joseph A. Broderick, as Superintendent of Banks of the State of New York, Plaintiff, *v.* Max Aaron and Others, defendants.

Supreme Court, New York County, May 17, 1934.

518

*Carl J. Austrian* [*Arthur Ofner, Harold N. Cohen, Warren C. Fielding, Edward I. Garfield, Maurice Cohen, Edward Weitz* and *Isadore H. Cohen* of counsel], for the plaintiff.

*Joseph J. Jacobs,* for the defendant Gertrude Adams; and various appearances for additional defendants.

LYDON, J.   This is an action originally instituted against 15,843 defendants to recover upon the assessment levied by plaintiff, as Superintendent of Banks, against the defendants, as stockholders of the Bank of United States.   Of the defendants originally named, default judgments have already been entered and the action severed against approximately 3,000 defendants and some 4,000 defendants have executed agreements, all of which were introduced in evidence upon the trial of this action, providing for the payment of their respective assessments in full upon stated terms and author-

izing the entry of judgment. The action has been discontinued against some 2,000 defendants, who have either paid their assessments in full, or upon whom plaintiff was unable to effect service of the summons and complaint, or for other reasons, such as bankruptcy and death. Approximately 3,000 of the remaining defendants have failed to appear or answer, and against these the trial proceeded by way of inquest.. An additional 3,000 defendants joined issue through service of their answers.

The allegations of the complaint with regard to the levy and necessity of the assessment are identical with the allegations of the complaint in *Broderick* v. *Adamson* (148 Misc. 353), in which action decision was rendered by me after trial sustaining the sufficiency of the complaint and the validity and necessity of the assessment and judgment entered in favor of the Superintendent. The sufficiency of the complaint in this action has been sustained against motions to dismiss. (*Broderick* v. *Aaron* [*Graf*], 147 Misc. 854; *Broderick* v. *Aaron* [*Feinbaum*], N. Y. L. J. Sept. 28, 1933.)

The evidence introduced by plaintiff establishes the following facts: The Bank of United States was organized as a banking corporation under the laws of this State in April, 1913, and continued in business until December 11, 1930, at which date its authorized and outstanding capital stock amounted to 1,010,000 shares of the par value of twenty-five dollars per share, representing a total capital of $25,250,000. Between December 1 and December 10, 1930, there was a steady shrinkage of deposits. On the 10th day of December, 1930, large runs and heavy and extraordinary withdrawals occurred at various branches of the bank resulting in a net decrease of deposits of more than $13,000,000 on that day. In order to provide cash to meet the demands of its depositors during this period the bank, which had borrowed steadily from the Federal Reserve Bank, was compelled on December 10, 1930, to borrow an additional $11,000,000 from that institution. These withdrawals, together with the outstanding checks and drafts payable in transit, left it with insufficient cash on hand to meet the present and prospective demand of its depositors. At a special meeting of the board of directors held early in the morning of December 11, 1930, a resolution was adopted directing its officers to request the Superintendent of Banks to take possession of the bank. In the face of this general situation the Superintendent decided that the Bank of United States could not with safety and expediency or in fairness to its non-withdrawing depositors continue its business, and he thereupon and on December 11, 1930, took possession of its business and property pursuant to the provisions of section 57 of the Banking Law.

Upon taking possession plaintiff proceeded to liquidate the affairs of the bank and gave due notice to creditors to present claims in compliance with the provisions of the Banking Law.

Prior to July 1, 1932, the Superintendent determined that the reasonable value of the assets of the bank was insufficient to pay its creditors in full to the extent of $30,000,000 and upwards. It appeared, indisputably, that on July 1, 1932, the reasonable value of the assets of the bank was $41,774,017.11, and its liabilities to depositors and other creditors amounted to $75,896,549.71, which with accrued interest thereon of $10,048,000 (*Broderick* v. *Adamson*, 148 Misc. 353, and cases cited), made the total aggregate liabilities $85,944,549.71, with a resulting net deficit of $44,170,532.60.

On July 1, 1932, the Superintendent, in accordance with statute (Banking Law, § 80), made due demand in writing upon all of the stockholders of record of the Bank of United States for the payment on August 8, 1932, of an assessment of twenty-five dollars for each share of stock held by each stockholder. The defendants so notified appeared as stockholders upon the stock ledger of the bank. (Banking Law, § 120, subd. 1.) Upon these facts I find that the assessment of twenty-five dollars per share was validly levied and necessary for the payment of the debts and obligations of the bank.

Passing from the general issue, numerous questions of law and fact affecting individual and groups of defendants remain to be determined.

### The Question of the Statute of Limitations.

Section 120 of the Banking Law provides that the action to enforce the assessment must be instituted within six (6) years after the cause of action has accrued.

Section 80 of the Banking Law provides in part: " Whenever a liability of stockholders for the amount of their respective shares of any such corporation exists, and the superintendent has duly taken possession of the property and business of such corporation, and has duly notified creditors to present and make proof of their respective claims and the last day to present such claims has expired, and he has determined from his examination of its affairs that the reasonable value of the assets of such corporation is not sufficient to pay its creditors in full, he may enforce the individual liability of such stockholders in whole or in part. In case he determines to enforce such liability, he shall make demand in writing upon such stockholders by causing such demand to be enclosed in sealed envelopes addressed and mailed, postage prepaid, to said respective stockholders at their last known places of address as the same appear upon the stock ledger of such corporation or at their last known

address if no address appears in said ledger. * * * Such demand shall also fix a date, not earlier than thirty days from the date of such notice, upon which such stockholders shall be required to pay such assessment to the superintendent. *In case any such stockholder shall fail or neglect to pay such assessment within the time fixed in said notice, the superintendent shall have a cause of action, in his own name as superintendent of banks, against such stockholder either severally or jointly with other stockholders of such corporation, for the amount of such unpaid assessment or assessments, together with interest thereon from the date when such assessment was, by the terms of said notice, due and payable.*"

Under this statute the assessment becomes " due and payable " after the determination by the Superintendent to assess and upon the maturity of the demand for its payment, and the right or cause of action to enforce the assessment accrues at that time.

This is the rule of the Federal courts in actions to enforce the statutory liability of stockholders of national banks. (*Aldrich* v. *Skinner*, 98 Fed. 375; *Armstrong* v. *McAdams*, 46 F. [2d] 931; *Rankin* v. *Barton*, 199 U. S. 228; *McClaine* v. *Rankin*, 197 id. 154; *Beckham* v. *Hague*, 38 Misc. 606; affd., 80 App. Div. 626.) In *Aldrich* v. *Skinner* (*supra*) the rule was stated as follows: " To determine whether this action is barred by the section of the Code last referred to, it is only necessary to fix definitely the date when the cause of action accrued. The defendant contends that the liability became certain, and the cause of action accrued, at the time of suspension of the bank, or, if not then, at the time when the receiver qualified and took charge of the assets and business of the bank. This position appears to me to be untenable. *A cause of action cannot be said to have accrued until it exists as a complete right, which some person, as the owner of such right, or as the representative of others, may enforce immediately by going into court and filing the necessary papers, upon which process may issue, to bring the adverse party within the jurisdiction of the court.* It is not true that the statutory liability of shareholders of national banking associations becomes absolute in all cases immediately upon the suspension of the bank. A bank may suspend payment because it has no money on hand to meet the demands of its creditors, nor ability to immediately convert other assets into money; and yet if, when an accounting is had, there is found to be an abundance of assets which may within a reasonable time be converted into money, so that all of the bank's indebtedness may be paid without an assessment upon shareholders, it would be wrong and unlawful to assess them. If, however, after such an accounting, with such a result, and before payment of the bank's indebtedness, valuable securities should

be lost, destroyed or shrink in value, so that the debts could not be paid in full without assessing shareholders, such a change in the conditions would render an assessment necessary. Considering the nature of the liability, and the purpose of the statute in creating it, it is obvious that it is essential to the right of a receiver of an insolvent national bank to sue the shareholders for assessments that the necessity for an assessment should first be ascertained by an accounting and appraisement of the assets, and the question as to the necessity for an assessment determined by competent authority. *The law vests the authority in the Comptroller of Currency, and until he orders an assessment the receiver of an insolvent national bank cannot take the first step towards compelling shareholders to pay assessments.* \* \* \*

" *The act of the Comptroller in ordering an assessment being indispensable as a precedent to the commencement of an action to enforce payment, the time limited for the commencement of such an action cannot commence to run until the assessment has been ordered.* As this action was commenced in less than seven months after the assessment became delinquent, and therefore in less than seven months after the cause of action accrued, it is not barred by the Statute of Limitations." (Italics mine.)

The Banking Law of this State was amended and revised to conform generally our scheme of bank regulation, liquidation and assessment enforcement to the statutory system applicable to national banks conducted through the Comptroller of Currency. (*Matter of Union Bank*, 204 N. Y. 313; *Van Tuyl* v. *Scharmann*, 208 id. 53.) (See Report of Commission on Banks, Dec. 1907; Report of Superintendent of Banks, 1908, Senate Document No. 6, 131st Session, p. XXIX.) The test of the accrual of the cause of action laid down by the Federal courts should, therefore, control.

*Van Tuyl* v. *Schwab* (174 App. Div. 665; affd., without opinion, 220 N. Y. 661) is not inconsistent with this view. That case is solely authority for the principle that upon the closing of a bank by the Superintendent because of its insolvency, the liability upon the assessment has potential existence and sufficient certainty to render it provable in bankruptcy as an accrued claim, and, therefore, dischargeable although no actual levy of an assessment has then been made. This holding was undoubtedly influenced by the policy of the Bankruptcy Act to afford to a debtor the right to free himself from all dischargeable obligations.

### ALLEGED MISCONDUCT OF THE LIQUIDATION.

Three hundred and sixty defendants alleged that the deficiency was caused by losses sustained through negligence of the Super-

intendent in the conduct of the liquidation. No evidence was offered upon the trial in support of this defense. Several of the defendants, however, have requested findings that the deficiency was so caused. In view of the entire absence of evidence upon the question, such finding must be refused. In any event the defense is without legal merit. (*Broderick* v. *Betco Corp.*, 149 Misc. 245; *Flynn* v. *American Bank & Trust Co.*, 104 Me. 141; *Brinkworth* v. *Hazlett*, 64 Neb. 592.)

## INFANCY.

Eighty-eight defendants have alleged and proved that on the date of their acquisition of the stock and until the closing of the bank they were minors under twenty-one years of age. Under the decision of the Appellate Division in *Broderick* v. *Aaron* (*Sternlieb*) (240 App. Div. 537) the complaint as against all of these infant defendants must be dismissed.

The defendants Walter Ross, Harry Surkes, Gladys Sherr and Leah Levy, although infants when they acquired their stock, became of age prior to the closing of the bank. The stockholders' liability constitutes a fund for the protection of depositors and creditors who are presumed to rely thereon in intrusting their moneys to the bank and for eventual reimbursement of their losses in case of insolvency. This peculiar relationship and situation requires that upon coming of age prompt and diligent steps be taken by a defendant asserting infancy as a defense to perfect his legal rights to rid himself of the status of stockholder by demanding the removal of his name from the stock ledger and disaffirming the transaction with his vendor. In my opinion the defendants have failed to discharge this duty and must, therefore, be liable for the several assessments imposed upon them.

The counterclaims of various of the infant defendants for a return of the purchase price claimed to have been paid by them to the Bank of United States upon the acquisition of the stock must be dismissed. These claims, if valid, must be asserted against the Bank of United States, and not the plaintiff in this action, who occupies a separate and distinct status as trustee for creditors, and whose rights and interest in that behalf may not be impaired or defeated through the assertion of claims against the bank. (*Van Tuyl* v. *Schwab*, 165 App. Div. 412; *Richards* v. *Schwab*, 101 Misc. 128.)

## FASHION WEAR DRESS COMPANY.

In 1929 one Ferbish and one Wertheim were copartners doing business under the name of Fashion Wear Dress Company and were the owners of twenty shares of stock which appear under such name upon the stock ledger of the bank. At that time the defend-

ant Maidman became a member of the firm and the shares of stock became part of the capital of the copartnership as reorganized. Under a private arrangement between Ferbish and Wertheim on the one hand and Maidman on the other, Maidman was to have no beneficial interest in the stock or the dividends declared thereon. It is claimed that this agreement exempts the defendant Maidman from liability upon the assessment. Under the arrangement the stock clearly became a partnership asset, and the title to the stock vested in each member of the firm, and this is in nowise altered or affected by the mere private or personal understanding of the parties with respect to the equities in the stock as between themselves.

WILLIAM KORNBERG CO., INC., WILCO-KORNBERG CO., INC.

I find from the evidence that on and prior to December 11, 1930, and until December 26, 1930, William Kornberg Co., Inc., was the owner of ten shares of stock appearing upon the stock ledger in the name " William Kornberg Co." Subsequent to the closing of the bank, and on December 26, 1930, the defendant Wilco-Kornberg Co., Inc., was organized and took over all of the assets of William Kornberg Co., Inc., including the stock in question and agreed to pay to all of its creditors seventy per centum of their claims. It appeared that the stock continued to sell on the open market at between one dollar and three dollars a share until after December 26, 1930. Plaintiff contends that under section 120 of the Banking Law a purchaser, even after closing, is subject to liability upon the assessment, and stands in the same position as an owner or holder of record at the time the Superintendent takes possession. I cannot accede to this. After closing the institution ceases to conduct banking operations, and no moneys are deposited or permitted to remain on deposit or credit extended upon the faith of the statutory liability, nor can creditors at the time of the closing of the bank reasonably claim a right to resort to the responsibility of purchasers subsequent to that time. I have not overlooked *Matter of National Bank of Wales* ([1897] 1 Ch. 298 [Court of Appeal]). That case was decided under a special and peculiar statute which specifically contemplated transfers after closing. Plaintiff, however, is entitled to judgment against the defendant Wilco-Kornberg Co., Inc., to the extent of seventy per cent of the assessment under its agreement to pay that percentage to all creditors of William Kornberg Co., Inc.

The defendant William Kornberg Co., Inc., the holder of the ten shares above discussed, and the defendant William Kornberg, the holder of certain other shares, were indebted to the Bank of United States at the date of its closing and thereafter settled and compromised their indebtedness and obtained a general release "from

any and all obligations " to the Bank of United States. Defendants rely upon this release as a discharge from the payment of their assessments. The Bank of United States, however, has no title to nor right to enforce or release the assessment liability of its stockholders and the release, therefore, constitutes no discharge of the assessment liability. (*Van Tuyl* v. *Schwab,* 165 App. Div. 412.)

## MOYSE & HOLMES.

In November, 1929, while the defendant E. Malcolm Deacon was a member of the firm of Moyse & Holmes, this copartnership purchased the thirty-five shares of stock which were registered in the name " Moyse & Holmes " upon the stock ledger of the bank. On December 31, 1929, Deacon retired from the copartnership, which was continued by the other members under the same name. There was no change made upon the stock ledger of the bank and the stock continued to appear in the name of Moyse & Holmes from November, 1929, until the date of its closing. I hold that the defendant E. Malcolm Deacon is not liable for the assessment and that to require the idle ceremony of re-registration of the stock in the same copartnership name after Deacon ceased to be a member is not in accord with rational business practice and would lead to a harsh and unreasonable result.

## RENNIE & CO., NATIONAL CITY BANK OF NEW ROCHELLE.

It appears that the defendants Burns, Butti, Cocks, Klein, Rennie, Shea, Shufelt and Vrionis were nominees of defendant National City Bank of New Rochelle in the holding of stocks and securities for the benefit of the bank, and operated under the name and style of Rennie & Co. While acting in such capacity 200 shares were placed in their name upon the stock ledger of the bank. Defendants contend that under the holding of *Schumacher* v. *Davis* (1 Fed. Supp. 959 [E. D. N. Y. 1932]) they cannot be held liable for the assessment. It was there held that a combination of employees acting as nominees without profit is not a copartnership, and that since its members were not owners of the stock they could not be held liable. This case seems to proceed upon the theory that liability for the assessment rests upon actual ownership. But this is not required under section 120, subdivision 1, of the Banking Law. (*Van Tuyl* v. *Robin,* 160 App. Div. 41; *Richards* v. *Robin,* 178 id. 535.) It has repeatedly been held in this State that an individual acting as a nominee and appearing as a stockholder of record is liable (*Broderick* v. *Adamson,* 148 Misc. 353; *Shellington* v. *Howland,* 53 N. Y. 371; *Richards* v. *Schwab,* 101 Misc. 128), and I see no distinction between the registration of stock in the

actual name of a nominee, and the registration of stock under such title or description as a nominee or group of nominees may designate to represent him or them for that purpose.

A further question is presented by the defense of the defendant National City Bank of New Rochelle. It appears that on and prior to December 9, 1930, the National City Bank of New Rochelle was the owner of the 200 shares of stock registered in the name of its nominee, Rennie & Co., and that on that date it sold and transferred the shares to purchasers in good faith and for a valuable consideration, and ceased to be the equitable or beneficial owner of the stock prior to December 11, 1930, the date of the closing of the bank. Defendant contends that it was neither the record, legal nor beneficial owner of stock at the date of the closing, and cannot, therefore, be held liable. But it is a familiar rule that a principal is liable for all obligations incurred by its agents within the course of their employment. Rennie & Co. became the registered holder of the stock, acting on behalf of the National City Bank of New Rochelle, and continued as its nominee until the closing of the Bank of United States, and upon the facts as they appear could look to it for indemnity against loss. The National City Bank of New Rochelle is co-extensive with the liability of its agent, Rennie & Co. (*McDonald* v. *Dewey*, 202 U. S. 510; *Geary St., etc., R. R. Co.* v. *Rolph*, 189 Cal. 59; *Davis* v. *Stevens*, 17 Blatchf. [U. S.] 259.) Nor is it necessary in an action of this character for plaintiff to elect between the liability of the agent or principal. This doctrine applies only where the decision to pursue the principal is inconsistent with a concurrent cause of action against the agent and usually operates where contractual obligations are involved. (*Georgi* v. *Texas Co.*, 225 N. Y. 410. Compare *Phelps* v. *Wait*, 30 id. 78.) The assessment liability is not contractual in the accepted legal sense of the term (*Rogers* v. *Jarden*, 3 Fed. Supp. 211), but it is of statutory origin. (*Christopher* v. *Norvell*, 201 U. S. 216; *McClaine* v. *Rankin*, 197 id. 154.) A fixed and absolute liability is imposed by statute upon designated classes and categories of persons. Rennie & Co. is liable as a stockholder of record. Since the liability was incurred by Rennie & Co., acting in behalf of the defendant National City Bank of New Rochelle, it is also liable. Plaintiff of course is limited to one satisfaction. (*Mosler Safe Co.* v. *Guardian Trust Co.*, 208 N. Y. 524.)

## MOSES D. JABLONER.

The defendant was administrator of the estate of one Adolph Jabloner, who died in 1928 owning twenty-eight shares of stock of the City Financial Corporation, a domestic business corporation. Defendant converted the City Financial stock into ten shares of

stock of the Bank of United States now appearing upon the stock ledger in his name as administrator. Section 120 of the Banking Law provides that where, in violation of his trust, a fiduciary invests in stock of a bank he becomes personally liable for the assessment. An administrator has no authority to invest in bank stock. (*Matter of Surpless*, 143 Misc. 48; Banking Law, § 239; Dec. Est. Law, § 111.) The exchange of City Financial Corporation stock constituted an unauthorized investment. It is no defense that the conversion may have been made with the consent of the beneficiaries of an estate. Rights and interests of creditors and others may be involved. Beneficiaries may not enlarge the powers of an administrator, trustee or other fiduciary and under the express language of section 120, the unauthorized investment having been made, defendant became personally liable.

### JULIUS B. STILWELL.

One Fannie B. Stilwell died possessed of certain shares of Central Mercantile Bank stock, leaving a will appointing the defendant Julius B. Stilwell executor. The will contained no provision authorizing the defendant to retain or continue investments or to make investments other than those authorized by law. The defendant, upon the merger of the Central Mercantile Bank into the Bank of United States, exchanged these shares for stock of the latter corporation. Upon the consummation of the merger the Central Mercantile Bank ceased to exist and the defendant became the holder of securities of an entirely different corporation. This, to my view, was the equivalent of a new investment and beyond his power as executor.

### ABE KESSLER, YETTA KESSLER.

These defendants sold their stock prior to December 9, 1930, and in the afternoon of that day delivered the certificates to a vice-president of the bank at its branch office located at Thirteenth avenue and Forty-seventh street, in the borough of Brooklyn, requesting that the stock be transferred upon the stock ledger to the purchaser.

The uncontested evidence shows that the Bank of United States maintained some fifty-nine branches throughout the city of New York and a stock transfer office at 70 Wall street, in the borough of Manhattan, and that under its established and regular business practice, certificates of stock delivered at its branch offices for transfer, other than the stock transfer office, were sent to the stock transfer office by messengers at approximately eleven o'clock A. M. on each business day. Under this procedure, the certificates

delivered by these defendants would have been transmitted by the Brooklyn branch to the stock transfer office at about eleven o'clock A. M. on the morning of December 10, 1930. The established practice of the stock transfer office in effecting a transfer of certificates of stock presented for transfer was as follows: Upon the day of receipt, the certificate of stock presented for transfer and the indorsement thereon are examined as to form and validity. If regular in all respects, the transfer office on the day of receipt prepares a new form of certificate in the name of the transferee and at the close of business on that day the new certificate so drawn is signed by an authorized officer of the bank. On the following business day, the old certificate in the name of the transferor, together with the new certificate made out in the name of the transferee, is delivered to the Chase National Bank, the register of the stock of the Bank of United States, where the certificates are examined as to genuineness and regularity. The new certificate is authenticated by the signature of the registrar and on the same day returned to the stock transfer office of the Bank of United States as proper in form for issuance and transfer, together with the old certificate, and the name of the transferor is canceled upon the stock ledger and the name of the holder of the new certificate entered thereon. All certificates of stock of the Bank of United States bear upon their face the following notice:

" This certificate is not valid until registered by the registrar.
' Registered:
" THE CHASE NATIONAL BANK OF
THE CITY OF NEW YORK,
*" Registrar.*
" By................   ...........
*" Assistant Cashier."*

The certificates of stock delivered by these defendants to the branch of the bank were never transmitted to its stock transfer office. Had the said certificates been delivered by the branch bank to the stock transfer office on the morning of December 10, 1930, the new certificates, under the procedure already outlined, would not have been authenticated by the registrar and returned by it to the Bank of United States for transfer upon its stock ledger into the name of the defendants' transferee until the 11th day of December, 1930. The Superintendent of Banks took possession of the Bank of United States before the opening of business at nine o'clock A. M. on December 11, 1930. Defendants contend that the non-transfer of the stock was caused by the negligence of the bank in failing to deliver the certificates to the stock transfer office.

But if the employees of the branch bank had transmitted the certificates in accordance with the reasonable and established practice already described no transfer upon the stock ledger could have been effected, since the certificate would not have been redelivered by the registrar for that purpose prior to the time the bank had passed into the hands of the Superintendent. Unfortunately for the defendants, the bank closed and its transfer office ceased to operate before the transfers requested by them could be effected in the ordinary course of business and they necessarily remained stockholders of record at the time of the closing of the bank. They, therefore, remain liable. (*Cook* v. *Carpenter*, 212 Penn. St. 177.) The question remains whether a mere presentation of stock for transfer to a branch office of a bank prior to its closing relieves the defendants from liability and is the practical equivalent of an actual transfer upon the books of the bank. Section 120 provides in part: "*No person who* has in good faith, and without any intent to evade his liability as a stockholder, *caused his stock to be transferred on the books of the bank* when such bank is solvent to any resident in this state of full age *previous to any default* in the payment of any debt or liability of the bank, shall be subject to any personal liability for any contracts, debts or engagements of the bank." Under this section mere presentation for transfer is not sufficient but it is necessary to cause the transfer to be made on the stock ledger prior to the closing of the bank in order to escape liability. As the certificates were not presented at such a time that the transfer could be effected in the reasonable and ordinary course of business, it cannot be said that defendants have in legal effect caused their stock to be transferred upon the books of the bank within the holding of *Whitney* v. *Butler* (118 U. S. 655); *Matteson* v. *Dent* (176 id. 521), and *Richards* v. *Robin* (178 App. Div. 535), cited by the defendants. In those cases the presentation for transfer was made long prior to the closing, and the failure to cause the transfer to be made was due to the wrongful or negligent omission of the officers of the bank. In *Earle* v. *Carson* (188 U. S. 42, at p. 53) the rule of *Whitney* v. *Butler* was formulated in the following language: "The court * * * proceeded to hold that the stockholder was not liable, because he had done everything in his power to secure the transfer, and hence his name remained on the register *by the neglect of the officers of the bank.*" (Italics mine.)

Similar considerations dispose of the like defense pleaded by the defendant Catherine Samuels.

## AL SCHWARTZ.

This defendant was a depositor in the Bank of United States, and shortly prior to its closing the bank held in safe-keeping for his account fifty shares of stock of the Bank of United States. The defendant signed an order directing the bank to sell his stock through the customary channels and also blank powers of attorney authorizing the bank to transfer title to the purchaser. The sale was effected through a brokerage house to which the certificates were delivered indorsed in blank. The stock was never transferred upon the stock ledger out of the name of the defendant Schwartz. There was no demand or request accompanying the instructions to sell that the shares be transferred out of his name upon the stock ledger or that they be sold or delivered in other than the customary method of effecting sales of securities. Under the Personal Property Law (§ 162) delivery of a certificate indorsed in blank is proper and, moreover, this is the general and customary method. The direction to sell and deliver under the blank stock transfer power was the equivalent of express instructions to sell in the usual and customary way on the open market through such agencies as the bank might select. There was, therefore, no presentation of the stock for transfer upon the stock ledger nor any duty on the bank to cause the shares to be transferred thereon. This was essential to relieve the defendant from liability. (*Van Tuyl* v. *Robin*, 80 Misc. 360; *Commissioner of Banks* v. *Cosmopolitan Trust Co.*, 253 Mass. 205; *Richmond* v. *Irons*, 121 U. S. 27; *Trust Co.* v. *Jenkins*, 193 N. C. 761.) The rule that mere notice to the bank that its stockholder of record is not the actual holder of the stock is no defense to the enforcement of the assessment reflects the same general principle. (*Broderick* v. *Pomerantz*, 148 Misc. 188.)

This also requires dismissal of the similar defenses asserted by the defendants Sam Schuster and Rose Silberstein.

## J. IRWIN SHAPIRO.

This defendant appears as a stockholder of record of twenty-five shares. On December 9, 1930, he sold this stock to one Birnbaum. Upon delivery of the stock he indorsed the certificates to Birnbaum and caused his signature to be witnessed by a notary public, and at noon on December 9, 1930, Birnbaum presented the certificates for transfer to the stock transfer office, which refused to accept the certificate for transfer on the ground that the indorsement of Shapiro was not guaranteed by a bank or member of the New York Stock Exchange in accordance with the general custom and practice governing the operations of transfer offices established upon the

trial. As I view it those guaranty requirements are reasonable and necessary for the protection of the corporation, and the mere attestation of the signature by a notary public is neither an actual nor substantial compliance with these essential requirements. The defendant, therefore, remains liable on the assessment.

In *Telegraph Co.* v. *Davenport* (97 U. S. 369) the defendant transferred plaintiff's stock upon a forged indorsement. In sustaining judgment for the plaintiff, the court said (pp. 371, 372): " The officers of the company are the custodians of its stock-books, and it is their duty to see that all transfers of shares are properly made, either by the stockholders themselves or persons having authority from them. *If upon the presentation of a certificate for transfer they are at all doubtful of the identity of the party offering it with its owner, or if not satisfied of the genuineness of a power of attorney produced, they can require the identity of the party in the one case, and the genuineness of the document in the other, to be satisfactorily established before allowing the transfer to be made.* In either case they must act upon their own responsibility. In many instances they may be misled without any fault of their own, just as the most careful person may sometimes be induced to purchase property from one who has no title, and who may perhaps have acquired its possession by force or larceny. Neither the absence of blame on the part of the officers of the company in allowing an unauthorized transfer of stock, nor the good faith of the purchaser of stolen property, will avail as an answer to the demand of the true owner."

### NATHAN HOCH, PAPAZIAN BROTHERS.

Shortly prior to the closing of the bank the defendant Nathan Hoch signed a written order instructing the Public National Bank to purchase for his account fifteen shares of stock of the Bank of United States. Defendant testified that in making the purchase he was acting for one Reis, and so advised the Public National Bank and requested it to transfer the stock into the name of the latter. While I am disinclined to accept this version of the transaction, apart from the question of credibility, defendant is nevertheless liable, since the error, if any occurred, was that of his own agent for which he must bear the consequence.

The defense of Papazian Brothers is substantially similar and is disposed of accordingly.

### JOHN P. BROGAN, MARY A. BROGAN.

On November 28, 1930, the defendants, the owners of certain collateral bankers bonds and Dairymen's League certificates, entered

into an agreement with Warren R. Wallace & Co., Inc., a corporation doing business in the city of Syracuse, to exchange these securities for the Bank of United States units. On December 2, 1930, Wallace & Co., Inc., advised defendants that eighty-four shares of the Bank of United States stock were in the course of transfer into their names and on December 8, 1930, the certificates were actually transferred upon the stock ledger. Physical delivery of the certificates was made shortly after the closing of the bank and were immediately returned to Wallace & Co., Inc., upon the ground that the purchase had been induced by fraudulent representations. Thereafter an action was instituted against Wallace & Co., Inc. In the ensuing litigation against Wallace & Co., Inc., defendants testified that it was represented to them that the Bank of United States stock was stock of a governmental institution. The jury returned a verdict in favor of the Brogans for the value of the securities which were delivered in exchange for the Bank of United States stock, and this verdict was upheld upon appeal (*Brogan* v. *Wallace & Co., Inc.*, 235 App. Div. 388). The facts recited relating to this litigation were introduced into evidence as a defense to this action. Plaintiff established that between December 2 and December 10, 1930, millions of dollars were deposited daily in the bank. It has been repeatedly held that fraud in inducing the purchase of stock, even if perpetrated by the bank itself, is no defense to the assessment. (*Scott* v. *Deweese*, 181 U. S. 202; *Commissioner of Banks* v. *Cosmopolitan Trust Co.*, 253 Mass. 205; *Broderick* v. *Adamson*, 148 Misc. 353.) In such a case equities in favor of the stockholder against his vendor cannot affect or impair the right of depositors who intrust their money to the bank in partial reliance upon the assessment liability of its stockholders. (*Thompson* v. *American State Bank*, 256 Mich. 245; *Blackert* v. *Lankford*, 74 Okla. 61; *Stufflebeam* v. *De Lashmutt*, 101 Fed. 367.) The remedy of defendants, if any, is by way of indemnity against their vendor.

### ARTHUR J. RIESER.

The defendant purchased and paid for 210 shares and directed his broker to transfer such shares to his son, also named Arthur J. Rieser. The stock was so recorded. Upon the question of fact presented I hold that the stockholder of record and the actual owner of these 210 shares at the time of the closing of the bank was the son, Arthur J. Rieser. The son, however, at the time of the purchase of the stock and until December of 1931, a year after the closing of the bank, was an infant under twenty-one years of age. The defendant is, therefore, liable, since he purchased these shares with his own funds and caused them to be transferred

to an infant. (Banking Law, § 120; *Early* v. *Richardson,* 280 U. S. 496; *Broderick* v. *Aaron* [*Sternlieb*], 240 App. Div. 537.) The 100 additional shares acquired in November of 1930 were purchased and paid for by the son, Arthur J. Rieser. As to these shares the defendant is entitled to judgment dismissing the complaint.

No costs will be awarded to either plaintiff or defendants.