DONALD R. DOREMUS AND ANNA E. KLEIN, PLAINTIFFS-APPELLANTS,.v. BOARD OF EDUCATION OF THE BOROUGH OF HAWTHORNE AND THE STATE OF NEW JERSEY, DEFENDANTS-RESPONDENTS.

Argued September 18, 1950—Decided October 16, 1950.

Mr. *Heyman Zimel* argued the cause for appellants.

Mr. *Henry F. Schenk,* Deputy Attorney General, argued the cause for respondents. Mr. *Theodore D. Parsons,* Attorney General, and Mr. *Alexander E. Fasoli* on the brief.

Mr. *Albert McCay* filed a brief for State Council of the Junior Order of United American Mechanics of the State of New Jersey as *amicus curiæ.*

The opinion of the court was delivered by

CASE, J. The judgment under appeal was entered in the Law Division of the Superior Court, Passaic County, and was brought here on our certification. The action was originated under the Declaratory Judgment Act by a proceeding in lieu of prerogative writ to test the constitutionality of *R. S.* 18:14–77 and 78. Those statutory provisions are:

18:14–77. "At least five verses taken from that portion of the Holy Bible known as the Old Testament shall be read, or caused to be read, without comment, in each public school classroom, in the presence of the pupils therein assembled, by the teacher in charge, at the opening of school upon every school day, unless there is a general assemblage of the classes at the opening of the school on any school day, in which event the reading shall be done, or caused to be done, by the principal or teacher in charge of the assemblage and in the presence of the classes so assembled."

18:14–78. "Nö religious service or exercise, except the reading of the Bible and the repeating of the Lord's Prayer, shall be held in any school receiving any portion of the moneys appropriated for the support of public schools."

Section 77 was enacted as ch. 263, *P. L.* 1916, slightly different in arrangement but with the same substance. Section 78 was enacted as sec. 114 of ch. 1 (2nd Special Session), *P. L.* 1903 (the general school act). Its predecessor was a provision in section 65 of the School Act Revision of 1867, ch. 179, *P. L.* 1867, as follows:

"It shall not be lawful for any teacher, trustee, or trustees, to introduce into or have performed in any school receiving its proportion of the public money, any religious service, ceremony or forms whatsoever, except reading the Bible and repeating the Lord's Prayer."

That provision was retained in sec. 65 of the Revision of 1867 (*Rev.* 1877, *p.* 1081, § 65), and in the amendatory Supplement of 1894 (*ch.* 102, *P. L.* 1894, *plac.* 220, *p.* 3052, *Gen. Stat.* 1895).

Considered with the statute was the directive issued by the defendant Board of Education of the Borough of Hawthorne that "any student may be excused during the reading of the Bible upon request." There was no request that a student

be excused. The public schools which provide the occasion for the controversy are supported in part by public funds contributed by the State to the school district for educational purposes and in part by funds raised exclusively in the school district by levy upon taxable property within the school district. There were no disputed facts. On cross-motions for summary judgment on the pleadings judgment went for the defendants, based on a holding that the statutory proceedings do not contravene the First or the Fourteenth Amendment of the United States Constitution.

Appellants present this line of reasoning: The principle of the separation of the church and state is established in the Constitution of the United States, namely, the First and Fourteenth Amendments which prohibit the intermingling of religious and secular education in the public schools; the reading of the Bible and the reciting of the Lord's Prayer in the public schools are religious services, religious exercises and religious instruction; they are of themselves in aid of one or more religions and in preference of one religion over another; and therefore those acts are contrary to the named constitutional provisions. The gist of the argument is that compliance with the statute necessarily involves sectarian worship and sectarian instruction and therefore violates the Federal Constitution.

The effective parts of the First and Fourteenth Amendments are these:

I. "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; * * *."

XIV. "All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

The pertinency of the Fourteenth Amendment is that it carried over to the states the prohibition imposed by the First Amendment upon Congress against impairing religious rights

of individuals. Therefore our question is whether the New Jersey statute violates the injunction which the First Amendment lays against making a law respecting an establishment of religion or preventing the free exercise thereof.

No one is before us asserting that his religious practices have been interfered with or that his right to worship in accordance with the dictates of his conscience has been suppressed. No religious sect is a party to the cause. No representative of, or spokesman for, a religious body has attacked the statute here or below. One of the plaintiffs is "a citizen and taxpayer;" the only interest he asserts is just that and in those words, set forth in the complaint and not followed by specification or proof. It is conceded that he is a citizen and a taxpayer, but it is not charged and it is neither conceded nor proved that the brief interruption in the day's schooling caused by compliance with the statute adds cost to the school expenses or varies by more than an incomputable scintilla the economy of the day's work. The other plaintiff, in addition to being a citizen and a taxpayer, has a daughter, aged seventeen, who is a student of the school. Those facts are asserted, but, as in the case of the co-plaintiff, no violated rights are urged. It is not charged that the practice required by the statute conflicts with the convictions of either mother or daughter. Apparently the sole purpose and the only function of plaintiffs is that they shall assume the role of actors so that there may be a suit which will invoke a court ruling upon the constitutionality of the statute. Respondents urge that under the circumstances the question is moot as to the plaintiffs-appellants and that our declaratory judgment statute may not properly be used in justification of such a proceeding. *Cf. New Jersey Turnpike Authority v. Parsons, 3 N. J.* 235; *Massachusetts v. Mellon,* 262 *U. S.* 447, at 488, 43 *Sup. Ct.* 597, 67 *L. Ed.* 1078, at 1085 (1923). The point has substance but we have nevertheless concluded to dispose of the appeal on its merits.

Was it the intent of the First Amendment that the existence of a Supreme Being should be negated and that the

governmental recognition of God should be suppressed? Not that, surely. The temper of the times during which the agitation for and the accomplishment of the amendment was had, the events which led to the adoption of the amendment, the contemporaneous and subsequent interpretation by way of statute and public practice, the very wording of the amendment, all forcefully support that answer.

Instances could be multiplied going to the undeniable result that the Constitution itself assumes as an unquestioned fact the existence and authority of God and that preceding, contemporaneously with and after the adoption of the constitutional amendment all branches of the government followed a course of official conduct which openly accepts the existence of God as Creator and Ruler of the Universe; a course of conduct that has been accepted as not in conflict with the constitutional mandate.

The United States Constitution in Article I, section 7 provides that the President shall have ten days (Sundays excepted) within which to determine whether he will affirm or veto a bill. The essential idea of an oath seems to be that it is a recognition of God's authority and an undertaking by the affiant to accomplish the transaction to which it refers as required by His laws. *Bouvier's Law Dictionary.* The Constitution recognized that divine authority by directing that in the alternative an oath or an affirmance be taken in certain instances. With particularity it framed the oath, or affirmance, to be taken by the President. The origin of the privilege, in the alternative, to affirm rather than to take an oath is not to be understood, necessarily, as a concession to disbelief in God. The privilege was accorded, or at least made more generous, in New Jersey, in 1727 because the Quakers, although a God-fearing group, were conscientiously scrupulous against taking an oath. See *Allinson's Laws (New Jersey, 1776), page 75.*

The first ten amendments, called the Bill of Rights, were offered and adopted speedily after the adoption of the Constitution and were a product of the motives and conditions

which culminated in the parent instrument. The confederated colonies and, later, the states organized as a constitutional nation, acknowledged the existence of and bowed before the Supreme Being. The Declaration of Independence, phrased in the political ideology of Thomas Jefferson, frankly grounded its position in the unalienable rights endowed by God, the Creator, made appeal to Him, the Supreme Judge of the world for the rectitude of that position and expressed trust in the Divine Providence for protection in the fulfillment thereof. The Articles of Confederation recited the beneficent intervention of the Great Governor of the world.

Contemporary construction of a constitutional provision which has been followed since the founding of our government is entitled to the greatest respect. *Ex Parte Richard Quirin,* 317 *U. S.* 1, 41, 63 *Sup. Ct.* 2, 87 *L. Ed.* 3, 20 (1942). *State v. Wrightson,* 56 *N. J. L.* 126, 206 (*Sup. Ct.* 1893). Specifically, acts by the first Congress, which proposed the first ten amendments, have been judicially considered as of the highest authority in providing a contemporaneous exposition of constitutional provisions. *Patton v. United States,* 281 *U. S.* 276, 300, 50 *Sup. Ct.* 253, 74 *L. Ed.* 854, 864 (1929); *Myers v. United States,* 272 *U. S.* 52, 174, 47 *Sup. Ct.* 21, 71 *L. Ed.* 160, 189 (1926). On September 24, 1789, the day the first Congress adopted the resolution submitting the First Amendment to the states, it adopted a resolution requesting the President to recommend to the people "a day of public thanksgiving and prayer, to be observed by acknowledging, with grateful hearts, the many signal favors of Almighty God, especially by affording them an. opportunity to establish a Constitution of government for their safety and happiness." *Benton, T. H. (Ed.), Annals of Congress, Abridged by J. C. Rivers (New York, D. Appleton-Century Co.,* 1858), *Vol. I, pp.* 914-915. That Congress also adopted a resolution providing for a chaplain for each house (*Id. p.* 932); and every session of Congress, from that time forward, has been convened with prayer.

Courts have functioned normally since before our national history began upon the assumption of the sanctity of an oath. Public officers uniformly qualify by being sworn. The statute (*Til. 28, § 453, U. S. C. A.*) upon the taking of an oath by the justices and judges of the United States courts is illustrative:

"Each justice or judge of the United States shall take the following oath or affirmation before performing the duties of his office: 'I, —————, do solemnly swear (or affirm) that I will administer justice without respect to persons, and do equal right to the poor and to the rich, and that I will faithfully and impartially discharge and perform all the duties incumbent upon me as ————— according to the best of my abilities and understanding, agreeably to the Constitution and laws of the United States. *So help me God.*'"

The Thanksgiving Proclamation issued annually by the President, founded originally in resolution and continued through the years by tradition, gives, by its continuity and content, a striking reflection of the acceptance by our nation, and specifically by our government, of the idea and the existence of God. Our coined dollar for years beyond memory has carried the inscription "In God We Trust." It seems, *McCollum v. Board of Education, 333 U. S. 203, 254, 92 L. Ed.* 649, 680 (dissenting opinion of Mr. Justice Reed), that not only does Congress still have in each house a chaplain who daily invokes divine blessings and guidance for the proceedings but that the armed forces have had commissioned chaplains from early days and that these chaplains, so commissioned, conduct public services in accordance with the liturgical requirements of their several faiths; and that chaplains are attached to each of the schools, governmentally supported and controlled, for the training of military and naval cadets. The United States Congress has enacted (*sec. 1464, New Title 18, Crimes and Criminal Procedure Act of June 25, 1948, U. S. C. A.*) that "whoever utters any * * * profane language by means of radio communication shall be fined not more than $10,000.00 or imprisoned not more than two years, or both." In our national anthem we reverently sing:

"\* \* \* May the heav'n rescued land
Praise the Power that hath made and preserved us a nation,
Then conquer we must, when our cause it is just
And this be our motto—'In God is our trust.' "

What has been said of the Federal Government could almost be repeated, *mutatis mulandis,* with reference to our State. For illustration: with respect to blasphemy, our own statute, *R. S.* 2:165–2, provides that any person who shall willfully blaspheme the name of God shall be guilty of a misdemeanor. An early statute, *III Anne,* 1704, *Allinson, p.* 3, punished, *inter alia,* "cursing" and "swearing." But the Crimes Act of March 18, 1796, *Paterson's Laws, page* 211, provided in section 20 the statutory cast that has come down through the various revisions without great change. *Elmer's Digest* (1838), *p.* 105, § 20. *Nixon's Digest* (1868), *p.* 195, § 22. *Revised Statutes* 1874, *p.* 144, § 66. *Rev.* 1877, *p.* 238, § 66, *ch.* 235, § 73, *P. L.* 1898, 2 *C. S., p.* 1770, § 73. Property used for religious purposes has long been and is largely exempt from taxation. *P. L.* 1851, *p.* 272; *ch.* 372, § 1, *P. L.* 1931; *N. J. S. A.* 54:4–3.6. Beyond that it may suffice for the purpose of showing our governmental attitude to refer to a persistent and specific recognition of "Almighty God" in the several Constitutions of our State. The first Constitution, adopted July 2, 1776, provided (Art. XVIII) that "No person shall ever within this colony be deprived of the inestimable privilege of worshiping Almighty God in a manner agreeable to the dictates of his own conscience; nor under any pretense whatsoever compelled to attend any place of worship, contrary to his own faith and judgment." The second Constitution, effective September 2, 1844, contained this preamble:

"We, the people of the State of New Jersey, grateful to Almighty God for the civil and religious liberty which He hath so long permitted us to enjoy, and looking to Him for a blessing upon our endeavors to secure and transmit the same unimpaired to succeeding generations, do ordain and establish this Constitution:"

It also repeated, in Art. I, par. 3, the language quoted *supra* (except the words "ever within this colony") from the first

Constitution. In both respects our present Constitution, adopted in 1947, follows the 1844 instrument.

The United States Supreme Court, speaking through Mr. Justice Brewer in *Church of the Holy Trinity v. United States,* 143 *U. S.* 457, 12 *Sup. Ct.* 511, 36 *L. Ed.* 226 (1892), found no dissonance in the provisions of the First Amendment and various official declarations placing God at the apex of all things and said: "There is a universal language pervading them all, having one meaning; they affirm and reaffirm that this is a religious nation. These are not individual sayings, declarations of private persons; they are organic utterances; they speak the voice of the entire people."

Appellants rely mainly on the decisions in the United States Supreme Court in *Everson v. Board of Education,* 330 *U. S.* 1, 91 *L. Ed.* 711 (1947), and *McCollum v. Board of Education, supra* (1948).

In the *Everson case* a New Jersey statute authorized the local school districts to make rules and contracts for the transportation of children to and from schools. A local school board, pursuant to the statute, authorized reimbursements to parents of money expended by them for the bus transportation of their children on regularly operated buses. A part of the money was for the payment of transportation of children to Catholic parochial schools. A taxpayer challenged the right of the board to reimburse parents of parochial school students and contended that the resolution violated both the State and the Federal Constitutions. The highest court of this State held (133 *N. J. L.* 350) that neither the statute nor the resolution was in conflict with either the State Constitution or the Federal Constitution. On appeal the United States Supreme Court decided that the statute and the resolution did not violate either the due process clause of the Fourteenth Amendment or the provision of the First Amendment that no law shall be made "respecting an establishment of religion."

A decision holding that a state may use tax moneys to transport children to a parochial school without violating the constitutional provision against an establishment of religion

is not, we conceive, an effective holding against the constitutionality of a state statute directing the reading without comment of a few Bible verses in a classroom. The issues are quite different. And the reasoning of the opinion does not, we think, have the pertinency for which appellants argue.

In the *McCollum case* the facts are shortly stated in a summary prefixed to the case as reported in 92 *L. Ed.* 649, as follows: "A local board of education in Illinois agreed to the giving of religious instruction in the schools under a 'released time' arrangement whereby pupils whose parents signed 'request cards' were permitted to attend religious-instruction classes conducted during regular school hours in the school building by outside teachers furnished by a religious council representing the various faiths, subject to the approval and supervision of the superintendent of schools. Attendance records were kept and reported to the school authorities in same way as for other classes; and pupils not attending the religious instruction classes were required to continue their regular secular studies." The court held that the facts showed the use of tax-supported property for religious instruction and a close cooperation between the school authorities and the religious council in promoting religious education, and, further, that the tax-supported public school buildings were used for the dissemination of religious doctrines and the state afforded sectarian groups invaluable aid in that it helped to provide pupils for their religious classes through use of the state's compulsory public school machinery. Legally, the court found that the arrangement was not a separation of church and state and therefore was in violation of the First Amendment. The facts are, upon their face, so different from ours that no discussion of them seems to be necessary. The outstanding feature of that case was that school property was being used for sectarian instruction and the correlated fact in the present case is that there was no sectarian act.

Appellants contend that the statutory direction provides for religious instruction and religious worship and is in aid of one or more religions and in preference of one religion

over another; and it is upon that argument that they seek support in the *Everson* and *McCollum* decisions. No charge is made that, in the reading, passages were selected with the purpose or the result of giving a sectarian bias; the Bible itself is indicted as sectarian. We are of the opinion that the characterizations of the statute and of the Book are not sound, that the holdings in the cited cases involve essential elements wholly lacking in the instant case, and that consequently the decisions are not in point and are not binding. Further, we think that the reasoning followed in reaching those decisions was not intended to, and does not, reach the facts of the present case.

Appellants concede that there are twelve states which prescribe the reading of the Bible in public school classes : Alabama, Arkansas, Delaware, Florida, Georgia, Idaho, Kentucky, Maine, Massachusetts, Pennsylvania, Tennessee and New Jersey; and that the statutes of five other states make its use permissive : Indiana, Iowa, Kansas, North Dakota and Oklahoma; and also that the cases on the subject which sustain the reading of the Bible (among them decisions by the courts of Texas, Colorado, Michigan, Minnesota and New York) outnumber the cases in which Bible reading was interdicted. It could be added that a by-law of the Board of Education (*By-Laws, Dist. of Columbia Board of Education, chap. 6,* § 4) requires the reading of the Bible and the Lord's Prayer in the public schools of the District of Columbia; that a Mississippi statute (*Mississippi Code, 1942, Title 24,* § 6672) requires a course in the Principles of Morality and Good Manners, the same to include "the mosaic ten commandments"; and that the Bible is read in a large number of schools in many states where the statutes are silent on the subject.

Appellants further state that the reading of the Bible in the public schools has been struck down in Illinois, Louisiana, Wisconsin and Ohio; and that while decisions upholding the reading of the Bible are more numerous, the better reasoning, "considered in the light of the United States Supreme Court decisions in the *Everson* and *McCollum cases,*" leads inevit-

ably to the conclusion of unconstitutionality. We have given our reasons for believing that the last-named Supreme Court decisions do not lead to or lean toward that conclusion; and we are not impressed by the alleged pertinency of the state decisions cited by appellants. *Finger v. Weedman,* 226 *N. W.* 348 (*S. Dakota Sup. Ct.* 1929), while adverse to Bible reading in the schools does not appear to have held the state statute unconstitutional and said that the public schools could, without opposition, "teach that there is an All-Wise Creator to whom we owe love, reverence, and obedience." The Ohio case of *Board of Education v. Minor,* 23 *Ohio St.* 211 (1872), was to the effect that inasmuch as the constitution of the state did not enjoin or require religious instruction or the reading of religious books in the public schools the court had no rightful authority to command the boards of education as to what instruction should be given or what books should be read. The Wisconsin case of *State ex rel. Weiss v. District Board of Education,* 76 *Wis.* 177, 7 *L. R. A.* 330 (*Wisconsin Sup. Ct.* 1890), arose on a petition to compel the reading of the Bible, and the holding was that the state constitution forbade the practice. *Ring v. Board of Education,* 245 *Ill.* 334, 92 *N. E.* 251 (*Illinois Sup. Ct.* 1910), held that the First Amendment to the Federal Constitution left the states free to enact such laws as they might deem proper with respect to religion, restrained only by limitations of the respective state constitutions, but that the reading of the Bible, the singing of hymns and the repeating of the Lord's Prayer were in violation of the provisions of the constitution of the State of Illinois. In *Herold v. Parish Board,* 136 *La.* 1034, 68 *So.* 116, 56 *L. R. A.* (*N. S.*) 1915D 941 (*Louisiana Sup. Ct.* 1915), the headnotes, drawn by the judge who wrote the opinion, stated that the reading of the Bible, including the Old and New Testaments, in the public schools, was a preference given to Christians and a discrimination made against Jews, and therefore was a violation of the constitution of the State of Louisiana. The opinion mentioned the First Amendment of the Federal Constitution, but it is evident that (1) the holding was not on

that provision and (2) that the holding turned largely upon the inclusion of the New Testament in the school exercises there under review. Those cases are appellants' chief reliance in that branch of their argument which goes to the position of states adverse to Bible reading.

*Cooley (Constitutional Limitations, Eighth Edition, vol. 2, p. 966)* lists five things which are not lawful under any of the American constitutions, namely, (1) any law respecting an establishment of religion, (2) compulsory support, by taxation or otherwise, of religious instruction, (3) compulsory attendance upon religious worship, (4) restraints upon the free exercise of religion according to the dictates of the conscience, (5) restraints upon the expression of religious belief. But, he adds (*p.* 974), "while thus careful to establish, protect, and defend religious freedom and equality, the American constitutions contain no provisions which prohibit the authorities from such solemn recognition of a superintending Providence in public transactions and exercises as the general religious sentiment of mankind inspires, and as seems meet and proper in finite and dependent beings. Whatever may be the shades of religious belief, all must acknowledge the fitness of recognizing in important human affairs the superintending care and control of the great Governor of the Universe, and of acknowledging with thanksgiving His boundless favors, of bowing in contrition when visited with the penalties of His broken laws."

We consider that the Old Testament, because of its antiquity, its content, and its wide acceptance, is not a sectarian book when read without comment. *Cf. Vidal v. Girard's Executors,* 2 *Howard* 127, 200, 11 *L. Ed.* 205, 235 (1844); *Hackett v. Brooksville Graded School District,* 120 *Ky.* 608, 87 *S. W.* 792, 69 *L. R. A.* 592 (*Kentucky Court of Appeals* 1905). It is accepted by three great religions, the Jewish, the Roman Catholic and the Protestant, and, at least in part, by others. There are different versions, but the statute makes no distinction. The adherents of those religions constitute the great bulk of our population. There

are religious groups other than the Jewish, the Roman Catholic and the Protestant, but in this country they are numerically small and, in point of impact upon our national life, negligible. This is not a criticism, simply the statement of a fact from which it is to be gathered that the tenets of these minor groups had no vital part in the formation of our national character. And it is not to say that because a religious group is small, it thereby loses its constitutional rights or that it is not entitled to the protection of those rights. The application is that some of our national incidents are developments from the almost universal belief in God which so strongly shaped and nurtured our people during the colonial period and the formative years of our constitutional government, with the result that we accept as a commendable part of our public life certain conditions and practices which in a country of different origins would be rejected; just as some acts would be offensive here which, as *Cooley* (*supra, p.* 975) says, "in a Mahometan or Pagan country might be passed by without notice, or even be regarded as meritorious." Again, take the instance of an atheist:—he has all the protection of the Constitution; he may not be held to any religious function or to the support, financial or otherwise, of a religious establishment; he may entertain his belief or the lack of belief as he will; but he lives in a country where theism is in the warp and woof of the social and the governmental fabric and he has no authority to eradicate from governmental activities every vestige of the existence of God. He could not, we hypothesize, prevent, on constitutional grounds, the houses of Congress from opening their sessions with prayer to the Almighty for guidance in their deliberations, even though he were a member of Congress, or from maintaining chaplains for service with the armed forces, even though he were a member of those forces. *Cf. Lewis v. Board of Education,* 157 *Misc.* 520, 285 *N. Y. Supp.* 164 (1935); modified, 247 *App. Div.* 106, 286 *N. Y. Supp.* 174; rehearing denied, 247 *App. Div.* 873, 288 *N. Y. Supp.* 751; appeal dismissed, 276 *N. Y.* 490, 12 *N. E.* 2d 172 (*N. Y. Ct. of Appeals* 1937). A

situation so supposed would be more exposed than our own to a charge of sectarianism because the argument might point to the sectarian affiliations of the clergyman or the chaplain. We are speaking in terms of the Constitution upon the situations which that document was intended to reach, specifically upon whether or not the inhibition against the making of a law respecting an establishment of religion or prohibiting the free exercise thereof is violated by the reading, without comment, of a few verses, daily, in our public schools, from the Old Testament, and upon whether a statute which requires that to be done sets up religious instruction, or religious worship, which, within the meaning of our cases, is in aid of one or more religions, or prefers one religion above another. The reading does not, obviously, effect or tend to effect the setting up, or the establishment, of a religion and, just as obviously, it does not prohibit the free exercise of any religion. We have noted the absence of allegation or proof that the plaintiffs or either of them are harmed by the statute of which they complain and we have withheld from considering a disposal of the case upon that technical ground; but we should, and do, recall that no burden of participation is put upon a pupil by the statute, and that by the regulation of the school board under whose jurisdiction the issue arose a pupil would, upon request, be excused from the classroom during the brief exercises. The contention that one religion is preferred above another is vague and intangible; no religious group is a party to the cause; no person or sect is charging that his or its beliefs are prejudiced. The incidents which were condemned in the *McCollum case* as being contrary to the separation of church and state appear to be entirely absent.

As to the permissive repeating of the Lord's Prayer: That short supplication to the Divinity was given its name because it was enjoined by Christ as an appropriate form of prayer. It is used by Roman Catholics and Protestants with slight variations. But nothing therein is called to our attention as not proper to come from the lips of any believer in God, His Fatherhood, and His supreme power. Christ was a Jew and

He was speaking to Jews; and it is said, on excellent Jewish authority (Dr. Philip Bernstein, Rabbi of the Temple B'reth Kodesh, Rochester, N. Y.; "What the Jews Believe," *Life Magazine, September* 11, 1950, *p.* 161), that the prayer was based upon the ancient Jewish prayer called "the Kaddish"—"Exalted and hallowed be the name of God throughout the world * * * May His Kingdom come, His will be done." *We find nothing in the Lord's Prayer that is controversial, ritualistic or dogmatic.* It is a prayer to "God, our Father." It does not contain Christ's name and makes no reference to Him. It is, in our opinion, in the same position as is the Bible reading and needs no special comment beyond what has just been said. *Cf. Church v. Bullock,* 109 *S. W.* 115, 16 *L. R. A.* (*N. S.*) 860 (*Texas Supreme Ct.* 1908).

■ While it is necessary that there be a separation between church and state, it is not necessary that the state should be stripped of religious sentiment. It may be a tragic experience for this country and for its conception of life, liberty and the pursuit of happiness if our people lose their religious feeling and are left to live their lives without faith. Who can say that those attributes which Thomas Jefferson in his notable document called "unalienable rights" endowed by the Creator may survive a loss of belief in the Creator? The American people are and always have been theistic. *Cf. Church of the Holy Trinity v. United States, supra.* The influence which that force contributed to our origins and the direction which it has given to our progress are beyond calculation. It may be of the highest importance to the nation that the people remain theistic, not that one or another sect or denomination may survive, but that belief in God shall abide. It was, we are led to believe, to that end that the statute was enacted; so that at the beginning of the day the children should pause to hear a few words from the wisdom of the ages and to bow the head in humility before the Supreme Power. No rites, no ceremony, no doctrinal teaching; just a brief moment with eternity. *Great results follow from elements which to human perception are small.* It may be

that the true perspective engendered by that recurring short communion with the eternal forces will be effective to keep our people from permitting government to become a man-made robot which will crush even the Constitution itself. Our way of life is on challenge. Organized atheistic society is making a determined drive for supremacy by conquest as well as by infiltration. Recent history has demonstrated that when such a totalitarian power comes into control it exercises a ruthless supremacy over men and ideas, and over such remnants of religious worship as it permits to exist. We are at a crucial hour in which it may behoove our people to conserve all of the elements which have made our land what it is. Faced with this threat to the continuance of elements deeply imbedded in our national life the adoption of a public policy with respect thereto is a reasonable function to be performed by those on whom responsibility lies. Subject to constitutional limitations, the Legislature has exclusive jurisdiction over matters of public policy, *Schenley Products Co. v. Franklin Stores Co.,* 124 *N. J. Eq.* 100, 105 (*E. & A.* 1937); *State v. Donovan,* 129 *N. J. L.* 478, 486 (*Sup. Ct.* 1943), and the courts should be very sure of their ground before they restrict that legislative field.

The statute under attack has been on the statute books for 47 years, and the substance of it, that is, the permission to read the Bible and to repeat the Lord's Prayer, for more than 80 years. It is common knowledge that the schools have conducted those exercises throughout such periods. This has been without question until now. As was said in *Legg v. Passaic County,* 122 *N. J. L.* 100 (*Sup. Ct.* 1939); affirmed, 123 *N. J. L.* 263 (*E. & A.* 1939), "* * * one of the fundamental policies of our jurisprudence is not to declare unconstitutional a statute which has been in force without any substantial challenge for many years unless its unconstitutionality is obvious." To same effect: *Attorney General v. McGuinness,* 78 *N. J. L.* 346, 371 (*E. & A.* 1909); *Jersey City v. Kelly,* 134 *N. J. L.* 239 (*E. & A.* 1946); *Robertson*

*v. Baldwin*, 165 *U. S.* 275, 17 *Sup. Ct.* 326, 41 *L. Ed.* 715, at 719 (1897).

██ ██ Manifestly, as we have indicated, the disputed statutes do not impinge upon the strict·wording of the First Amendment. They do not go to the establishment of religion or against the free exercise thereof. How far the intendment of the amendment goes beyond the literal phrasing thereof has never been determined. But it is clear, we think, that the sense of the amendment does not serve to prohibit government from recognizing the existence and sovereignty of God and that the motives which inspired the amendment and the interpretation given by the several departments of the Federal Government concurrently with and subsequent to the submission and adoption of the amendment are inconsistent with any other conclusion. It is a cardinal rule in the construction of constitutional and statutory enactments that the provision made by way of remedy shall be studied in the light of the evil against which the remedy was erected. The conditions which gave rise to the First Amendment have been graphically portrayed by Mr. Justice Black in the opinion written by him for the United States Supreme Court in the *Everson* case; a factual background which doubtless ruled the decisions in that case and in the *McCollum* case; and a background to which, as we believe, the facts in the instant case have no real similarity. The lure is to color all things, including fundamental facts, with the philosophy prevailing at the hour of observation; but facts are facts, stark and naked; they do not change. The fact is that the First Amendment does not say, and so far as we are able to determine was not intended to say, that God shall not be acknowledged by our government as God. Our view is that a prohibition which is not in the language of the amendment and which is contrary to the intention of those who framed and adopted the instrument should not now be read into it. We consider that the Old Testament and the Lord's Prayer, pronounced without comment, are not sectarian, and that the short exercise provided by the statute does not constitute sectarian instruction

or sectarian worship but is a simple recognition of the Supreme Ruler of the Universe and a deference to His majesty; that since the exercise is not sectarian, no justiciable sectarian advantage or disadvantage flows therefrom; and that, in any event, the presence of a scholar at, and his participation in, that exercise is, under the directive of the Board of Education, voluntary.

We conclude that the statutes are not in violation of the Federal Constitution and that the judgment below should be affirmed.

*For affirmance*—Chief Justice VANDERBILT, and Justices CASE, HEHER, OLIPHANT, WACHENFELD, BURLING and ACKERSON—7.

*For reversal*—None.