PHILLIP M. CARDEN *et al. v.* MRS. TOM A. BLAND *et al.*

(*Nashville,* December Term, 1955.)

Opinion filed March 9, 1956.

C. VERNON HINES, of Nashville, for appellants.

RAYMOND H. LEATHERS and ROBERT H. JENNINGS, JR., both of Nashville, for Board of Education.

JACK WILSON, Assistant Attorney General, for George F. McCamless, Attorney General.

Mr. Chief Justice Neil delivered the opinion of the Court.

The complainant filed his original injunction bill in the Chancery Court of Davidson County, Tennessee, against the members of the Board of Education of the City of Nashville alleging that he is a citizen and tax-payer of said City and that the Board of Education of Nashville operates the public school system of the City; that as a tax-payer he and his children (who are of school age and are attending school) will be, and are, prejudiced by the appropriation of public funds for the maintenance and operation of the public schools by the defendant Board of Education in that said Board is violating the Constitutions of the United States and the State of Tennessee as hereinafter stated. The bill is filed by complainant for and on behalf of his minor children (named therein) and himself seeking an injunction to restrain the Board members and others from engaging in certain practices with reference to the requirements of students to attend Sunday School, and make a report of such attendance to school authorities; that a declaratory judgment be pronounced by the Chancellor declaring that Code Section 49-1307(4) of T. C. A. is unconstitutional and void. The Section of the Code so assailed reads, as follows:

"*Duties of teachers.*—It shall be the duty of the teacher:

\* \* \* \* \* \*

"(4) To read, or cause to be read, at the opening of the school every day, a selection from the Bible and the same selection shall not be read more than twice a month."

The charges in the bill regarding the compulsory attendance at Sunday School are, that those who had failed to attend Sunday School were required, as a penalty, to copy many verses from the Bible; that on each Monday morning the teacher ("or this teacher") regularly followed a practice of requesting that those pupils who had attended Sunday School the day before *to stand;* that those who remained seated were given special assignments, i. e. to copy some portions of the Bible. It is also charged that "some of the teachers" at "Ross School" kept and displayed in the classroom a record of attendance of their pupils at Sunday School and that during school hours they conducted a devotional period consisting of reading from the Bible and saying the Lord's Prayer as it appears in the King James version.

The complainant further charges that the "aforesaid practices were embarrassing and offensive to him and to his said child and were in violation of their constitutional rights."

The following complaint is made regarding requirements of pupils in a particular Junior High School, the complainant's son, John W. Carden, being a pupil in said school:

"The complainant John W. Carden is and was during the past school year a student at East Nashville Junior High School, a school maintained and operated by and under the supervision of the defendants, the Board of Education of the City of Nashville. The complainants aver that it is a regular and customary practice among certain of the teachers in that

school including certain of the teachers of the complainant John W. Carden, during the regular school hours and in the classrooms, to read, or have some pupil read from, the Bible; to ask questions of the pupils, including the complainant John W. Carden, concerning the content of such passages; to repeat prayers, usually that prayer known as the Lord's Prayer as it appears in the sixth Chapter of the Book of Matthew in the King James version of the Bible; to sing hymns and other religious songs; and to inquire of the pupils as to their attendance or non-attendance at Sunday School.''

The complainant finally charges ''that the said practices and each of them are contrary to their religious beliefs and principles; and that they have been and will continue to be aggrieved, offended and embarrassed by the said practices thus sanctioned and approved by the defendant Board of Education.''

Following the charge in the bill of the foregoing orders, directions and practices of teachers in the public schools, it is averred that all such amount to the unlawful use of school funds to support public worship contrary to Article 1, Sec. 3 of the Constitution of Tennessee and the First and Fourteenth Amendments to the Constitution of the United States.

The bill prays for an injunction to restrain the Board of Education from continuing the practices complained of and to declare Section 49-1307(4), T. C. A., unconstitutional.

The Attorney General of the State demurred to the bill on the following grounds:

1. ''There is no equity on the face of the bill.

2. ''It does not appear from the bill that the complainants, or any of them, have such special interest

in the subject-matter of the suit as entitles them to maintain this action.

3. "It does not appear from the bill that Section 2343(4) of the Code of Tennessee violates Article 1, Section 3, of the Constitution of Tennessee.

4. "It does not appear from the bill that Section 2343(4) of the Code of Tennessee violates the First Amendment to the Constitution of the United States.

5. "It does not appear from the bill that Section 2343(4) of the Code of Tennessee violates the Fourteenth Amendment to the Constitution of the United States.

6. "Section 2343(4) of the Code of Tennessee is a valid constitutional enactment which does not violate the Constitution of Tennessee or the Constitution of the United States in any particular."

The defendant Board of Education filed a separate demurrer averring, "It does not appear from the bill that the complainants, or any of them, have such special interest in the subject matter of the suit as entitles them to maintain this action"; that the Code Section is a valid constitutional enactment and does not violate either the Constitution of Tennessee or the Constitution of the United States "in any particular."

The Chancellor sustained each of the demurrers and the cause is now before us on appeal, his action being assigned as error.

Since counsel has conceded in argument that all the practices complained of with reference to requiring pupils to attend Sunday School, and penalties imposed for non-attendance, etc., have ceased, it will not become necessary in this opinion to consider and determine the legality of such practices and conduct, other than to say that it is beyond the scope and authority of School Boards

and teachers in the public schools to conduct a program of education in the Bible and undertake to explain the meaning of any chapter or verse in either the Old or the New Testament.

While there are numerous authorities which seem to sustain the contention of both the State's Attorney General and the School Board that complainants have not shown that they have such special interest that entitles them to maintain this suit, we feel that it should not be dismissed on that ground because of the general public interest involved, and more especially the interest of pupils, most of whom are at an impressionable age, and who cannot otherwise speak for themselves.

The demurrer to the bill admits certain practices generally, such as singing religious songs, reading a verse in the Bible each day without comment, and repeating the Lord's Prayer. But contention, however, is made that such public school exercises do not involve the question of "religious liberty" or "freedom of conscience," and in no way does it violate either the State or Federal Constitution. The sole question at issue is whether or not the statute quoted at the outset in this opinion violates the Constitution of this State and that of the United States.

Article 1, Sec. 3 of our Constitution reads, as follows:

"That all men have a natural and indefeasible right to worship Almighty God according to the dictates of their own conscience; that no man can of right be compelled to attend, erect, or support any place of worship, or to maintain any minister against his consent; that no human authority can, in any case whatever, control or interfere with the rights of conscience; and that no preference shall ever be given, by law, to any religious establishment or mode of worship."

Amendment 1 to the United States Constitution is, as follows:

"Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the government for a redress of grievances."

The two sections above quoted are practically synonymous. If anything, our own organic law is broader and more comprehensive in its guarantee of freedom of worship and freedom of conscience, in that *"no prefer- ence shall ever be given, by law, to any religious es- tablishment or mode of worship."* (Italics ours.)

It will doubtless be conceded that the fundamental reason which prompted the adoption of the "Bill of Rights," and more particularly that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof," was the fear of State authority over the human conscience, and that in the course of events there would be a prohibition against the freedom of worship and "freedom of assembly," etc. The "Founding Fathers" were not living in a vacuum. They knew full well as a matter of history of all religious wars, the bloody conflicts resulting from different religious beliefs, and the power of the sovereign to enforce supreme authority over the minds and conscience of every subject. Throughout the entire history of the Middle Ages in Europe there was a continuing conflict between the Church and State for temporal authority, the Church exercising at times complete dominion over the State. This conflict continued among the early colonial settlers of New England. There were trials and convictions of alleged blasphemers who were accused of being teachers

of false doctrines. Roger Williams was banished because he advocated "divers new and dangerous opinions against the Magistrates." See Stokes, Church and State, p. 195. The trial and execution of persons charged with the crime of "witchcraft" was a blot upon American history.

One needs to only read the history of the bloodshed and tyranny of religious fanatics, each claiming to be infallible, to appreciate the constitutional inhibition against compelling any citizen to make contributions to the maintenance of any religious institution or the establishment of any form of worship. The State of Tennessee follows the mandate of the Federal Constitution and respects all religious groups and the freedom of all citizens to worship God according to the dictates of their own conscience. The laws favor no creed or any form of worship in any degree.

As we view our statute herein assailed we are firmly convinced that the reading of a verse in the Bible without comment, the same verse not to be repeated more often than once every thirty days, the singing of some inspiring song, and repeating the Lord's Prayer, is not a violation of the constitutional mandate which guarantees to all men "a natural and indefeasible right to worship Almighty God according to the dictates of their own conscience"; nor is it reasonable to suppose that it is in support of any place or form of worship, or an effort to "control or interfere with the rights of conscience." (Italics ours.)

Much is said in argument of able counsel about the wisdom of separation of Church and State, and also of one's own personal right to worship as he sees fit, i. e. according to the ritual of his own church. To all of which we give our whole-hearted assent. But the counsel, it

seems to us, confuses an hour, or a short period of reverence, or a simple act of spiritual devotion as being a form of worship that is being sponsored and approved by an agency of the State to the prejudice of other religious groups. We find it more or less difficult to conceive that these simple ceremonies amount to "establishment of a religion," or any attempt to do so; nor is it an interference with any student's secular beliefs contrary to law.

While there is conflict of authority, we find a number of decisions by State Appellate Courts which hold that Bible reading in the public schools is not in violation of one's constitutional rights. In *Everson* v. *Board of Education*, 330 U. S. 1, 67 S. Ct. 504, 91 L. Ed. 711, it is held that the First Amendment to the Constitution meant that neither a State nor the Federal Government can set up a church. Neither can pass laws which aid one religion, all religions, or prefer one religion over another. Also in *Zorach* v. *Clauson*, 343 U. S. 306, 72 S. Ct. 679, 684, 96 L. Ed. 954, the majority of the Court holds: "The government must be neutral when it comes to competition between sects." Other cases dealing with this question are *People of State of Illinois ex rel. McCollum* v. *Board of Education*, 1948, 333 U. S. 203, 68 S. Ct. 461, 92 L. Ed. 648, 649; *Doremus* v. *Board of Education*, 342 U. S. 429, 72 S. Ct. 394, 96 L. Ed. 475. In the latter case it was said by the New Jersey Court: "We consider that the Old Testament and the Lord's Prayer pronounced without comment, are not sectarian, and that the short exercise provided by the statute does not constitute sectarian instruction or sectarian worship". 5 N. J. 435, 75 A. (2d) 880, 888.

Turning now to State cases we think the greater number of these decisions hold that the Bible is not a sectarian

or denominational book. Thus in *Evans* v. *Selma Union High School Dist.*, 193 Cal. 54, 222 P. 801, 31 A. L. R. 1121, the Court holds that the King James version of the Bible was not within the prohibition of the statute that "no publication of a sectarian, partisan, or denominational character" may be used or distributed in any school or made a part of any school library. See cases cited in the opinion. In an early case in Pennsylvania, *Hart* v. *Sharpsville Borough School Dist.*, (1885), 2 Lanc. L. Rev., 346, and *Stevenson* v. *Hanyon,* 1898, 7 Pa. Dist. & Co. R. 585, it was held that the reading of the Bible, whether the King James or the Douay version, as a part of the opening exercises of the public school was not in contravention of any constitutional provision.

In *People ex rel. Vollmar* v. *Stanley,* 1927, 81 Colo. 276, 255 P. 610, 612, the relator (a member of the Catholic Church) sought by mandamus to compel the Board of Education to revoke their rule requiring the reading of portions of the King James version of the Bible without comment as a part of the opening of morning school exercises. The Court held that Bible reading could not be prohibited altogether. The Court further holds:

"Reading of the Bible in public schools without comment *held* not teaching of sectarian tenets and doctrines, contrary to Const. art. 9, § 8; King James Bible not being sectarian."

"Reading of the Bible in public schools *held* not to constitute expenditure of public money in aid of 'sectarian purpose,' in violation of Const. art. 9, § 7, where Bible was read without comment; Bible itself not being sectarian."

"Right of parents under Const. U. S. Amend. 14, § 1, to have their children taught what they desire, is subject to qualification that teachers and places

must be reputable and things taught not immoral or inimical to public welfare."

It has been held that such reading of the Bible, as in *Hart* v. *School Dist.*, supra, does not make the school house a house of religious worship within the meaning of a constitutional prohibition against compelling any person to attend or support any place of religious worship, religious sect or denomination against his consent. In *Commonwealth ex rel. Wall* v. *Cooke*, Mass. 1859, 7 Am. Law Reg. 417, dealing with the reading of the Bible in public schools the Court holds : "* * * the constitutional provision securing liberty of conscience and worship 'was intended to prevent persecution by punishing for religious opinions. The Bible has long been in our common schools. * * * It was placed there as the book best adapted from which to ''teach children and youth the principles of piety, justice, and a sacred regard to truth, love for their country, humanity, and a universal benevolence, sobriety, moderation, and temperance. * * *'' But in doing this no scholar is requested to believe it; none to receive it as the only true version of the laws of God.' '' See also *Spiller* v. *Woburn*, 1866, 12 Allen 127, 94 Mass. 127. To the same effect is *Donahoe* v. *Richards*, 38 Me. 379, 61 Am. Dec. 256.

In *Kaplan* v. *Independent School Dist.*, 1927, 171 Minn. 142, 214 N. W. 18, 57 A. L. R. 185, the Court holds that reading of a particular version of the Bible without comment (in the public schools) is not *per se* an infringement of constitutional rights.

The decision of the Supreme Court of New Jersey in *Tudor* v. *Board of Education, etc.*, 14 N. J. 31, 100 A. (2d) 857, 45 A. L. R. (2d) 729 is contrary to the views herein expressed. In that case the Court holds that the distribution of Gideon Bibles to children in the public schools

was unconstitutional as showing a preference of one religion over another by school authorities, the Bible being the King James version and confined principally to the New Testament, and distributed at the written request of parents of each child. It should be distinguished from the instant case as shown by the facts averred in the original bill as well as by the express provisions of our statute.

With all deference to counsel for the complainants, we feel that they have taken a rather narrow and dogmatic view of these constitutional inhibitions. In their commendable zeal in behalf of liberty of conscience, and of religious worship, they have overlooked the broader concept that religion *per se* is something which transcends all man-made creeds.

We are asked to banish the Bible from the public schools, not as an evil thing, but that it is embarrassing to parents who subscribe to some creed or ritual, and that their children may be prejudiced in some way against their religion. Implicit in this contention is the thought that all children singing great and inspiring songs such as ''Faith of our Fathers'', and ''America the Beautiful'', is so contrary to their own faith that it should be enjoined as being a preference of one religion over another. They would indeed strike from the schoolroom and school libraries the great stories in the Bible which recount the deeds of heroic men and women and of their enduring faith in God, of love and devotion, of high honor and of duty to respect the will of the Creator, which have enriched the lives of all races from the beginning of recorded time.

Following the oral argument of this case, the American Civil Liberties Union filed a brief as Amicus Curiae, previously granted by the Court. This brief is filed on

behalf of the plaintiff in error. It would unduly prolong this opinion for us to make response to every contention made on the brief. The brief supports the general insistence that our statute is unconstitutional as being violative of both the State and Federal Constitutions.

Because of the importance of the question, and in view of some of the Federal Court decisions relied on, we feel constrained to further consider the question. We are not wholly oblivious to the extent to which the courts, both State and Federal, have gone in reviewing State statutes involving Bible reading and religious instruction in our public schools. They are numerous. But these statutes have been stricken down only when instruction in the Bible was made compulsory. *People ex rel. Ring* v. *Board of Education,* 245 Ill. 334, 92 N. E. 251, 29 L. R. A., N. S., 442.

In order to wipe out any and all right of the State to control their own system of public education great stress is laid upon the need of maintaining the doctrine of ''Separation of Church and State''. We concede that this is important. But it should not be tortured into a meaning that was never intended by the Founders of this Republic, with the result that the public school system of the several states is to be made a Godless institution as a matter of law.

We are referred to *People of State of Illinois ex rel. McCollum* v. *Board of Education,* 333 U. S. 203, 68 S. Ct. 461, 92 L. Ed. 648; and *Everson* v. *Board of Education,* 330 U. S. 1, 67 S. Ct. 504, 91 L. Ed. 711, to sustain the jurisdiction of the Supreme Court of the United States to strike down State statutes as being an interference with freedom of conscience and freedom of religion, and that they in some way involve the doctrine of ''Separation of Church and State''.

As we view these decisions the conclusions reached are irreconcilable. In the McCollum case, supra, the petitioner was an atheist and sought to enjoin the Board of Education from supporting a form of religious instruction contrary to the Federal Constitution in that the schoolhouse was erected and maintained by public funds, and she, as a taxpayer, was onerated with an additional burden. The practice of religious instruction was outlawed on the latter theory and also that the Board was engaged in promoting religious sects which was in violation of the principle of "Separation of Church and State".

In the Everson case, supra, the conclusion was the reverse, the Court holding that the Board of Education was permitted to allocate funds to subsidize school buses to transfer pupils to a denominational school, and did not support a church. The whole doctrine of Church and State was reviewed with the above result. In the first case Mrs. McCollum's contention was sustained that it was unconstitutional for her child to be exposed to any form of religious instruction. In the latter case the church school was favored and likewise the church itself was in truth recognized as a favored institution. This was the truth of the Court's decision regardless of any contention to the contrary.

The Court cites Thomas Jefferson as being the author of the "Separation of Church and State", as provided in the First Amendment to the Constitution, he having coined the phrase that there must be "a wall of separation between church and State." There was no convincing argument as to just what the wall was to separate. In the Everson case it was pointed out that Jefferson had favored religious instruction at the University of Virginia, of which he was the founder, and which was supported by the State. It appears that the method of

such instruction at the University was similar in most respects to that which the Supreme Court had outlawed in the McCollum case.

Mr. Justice Jackson concurred in the opinion on the ground that the method of instruction amounted to *proselyting* pupils. He exposed, however, with great ability the fallacy of driving all religion from the public schools. He says [333 U. S. 203, 68 S. Ct. 477]:

"And I should suppose it is a proper, if not an indispensable, part of preparation for a worldly life to know the roles that religion and religions have played in the tragic story of mankind. The fact is that, for good or for ill, nearly everything in our culture worth transmitting, everything which gives meaning to life, is saturated with religious influences, derived from paganism, Judaism, Christianity—both Catholic and Protestant—and other faiths accepted by a large part of the world's peoples. One can hardly respect a system of education that would leave the student wholly ignorant of the currents of religious thought that move the world society for a part in which he is being prepared."

It thus appears that the protagonists in this contest for the maintenance of freedom of religion and separation of the Church and State have falsified the history of the times, especially when they undertake to call Mr. Jefferson to their standard. And the same is true of other distinguished contemporaries who are referred to in the opinion.

From a historical point of view the Federal Government has, from time immemorial, given its express approval to secular worship in the United States Naval Academy, West Point Military Academy, and all of the armed forces of our country. It is thus pointed out by

Mr. Justice Reed in his dissenting opinion, which is not controverted:

"The Congress of the United States has a chaplain for each House who daily invokes divine blessings and guidance for the proceedings. The armed forces have commissioned chaplains from early days. They conduct the public services in accordance with the liturgical requirements of their respective faiths, ashore and afloat, employing for the purpose property belonging to the United States and dedicated to the services of religion. Under the Servicemen's Readjustment Act of 1944, eligible veterans may receive training at government expense for the ministry in denominational schools. The schools of the District of Columbia have opening exercises which 'include a reading from the Bible without note or comment, and the Lord's prayer.'"

We do not wish, however, to be understood as holding that any form of sectarian worship, or secular instruction in the Bible, is permissible under our statute and the Constitution of this State. But we cannot close our eyes to the customs and practices as pointed out by Mr. Justice Reed, as evidence of the fact that the President of the United States, as Commander in Chief of the Armed Services, as well as other agencies of the Federal Government, do not consider such activities as being in violation of the First and Fourteenth Amendments to the United States Constitution.

██ In conclusion we think that the highest duty of those who are charged with the responsibility of training the young people of this State in the public schools is in teaching both by precept and example that in the conflicts of life they should not forget God. And this in substance is about all that our statute requires. For this

Court to hold that the statute herein assailed contemplates the establishment of a religion, and that it is a subtle method of breaking down Mr. Jefferson's "wall of separation" between church and State, would be a spectacular exhibition of judicial sophistry.

There is no error in the Chancellor's decree, and it is affirmed.