143 So.2d 21 (1962)
Harlow CHAMBERLIN, On His Own Behalf and in Behalf of All Other Persons Similarly Situated, Appellant,
v.
The DADE COUNTY BOARD OF PUBLIC INSTRUCTION et al., Appellees,
v.
David HUME et al., Intervening Appellees.
Edward RESNICK, Philip Stern, and Elsie Thorner, in Their Own Behalf, and in Behalf of All Other Persons Similarly Situated, Appellants,
v.
The DADE COUNTY BOARD OF PUBLIC INSTRUCTION et al., Appellees,
v.
David HUME et al., Intervening Appellees.
Nos. 31545, 31546.
Supreme Court of Florida.
June 6, 1962.
Rehearing Denied July 31, 1962.
*22 Howard W. Dixon, Herbert L. Heiken and Tobias Simon, Miami, for Harlow Chamberlin.
Smith & Mandler, Miami Beach, and Leo Pfeffer, New York City, for Edward Resnick et al.
Bolles & Prunty, Miami, for Dade County Board of Public Instruction, et al.
Brigham, Wright, Goodwin & Dence and E.F.P. Brigham, Miami, for David Hume et al.
CALDWELL, Justice.
These two cases are here upon direct appeal from a final decree of the circuit court of Dade County construing controlling provisions of the federal and state constitutions, ruling upon the validity of a state statute and upon certain complaints hereinafter discussed.
Harlow Chamberlin, on his own behalf and in behalf of all other persons similarly situated, a plaintiff below, appellant here, *23 and Edward Resnick, Philip Stern and Elsie Thorner, in their own behalf and in behalf of all other persons similarly situated, plaintiffs below, appellants here, brought separate actions against the Dade County Board of Public Instruction, appellee here, to enjoin certain alleged religious practices in the Dade County public schools, praying that Section 231.09, F.S.A., be declared to be in violation of the First and Fourteenth Amendments to the United States Constitution and Sections 5 and 6 of the Declaration of Rights of the Florida Constitution, F.S.A. Nether suit alleged specific acts as being in violation of Section 5 of the Declaration of Rights of the Florida Constitution.
Both complaints seek relief by way of injunction and declaratory judgment and, as to the specific acts asserted to be in violation of the federal and state constitutions, they are identical.
The chancellor found that both cases involved similar issues and prayers for relief and consolidated them for the purpose of trial. A single brief is submitted in this appeal on both cases.
The plaintiff in the Chamberlin suit is an agnostic and the plaintiffs in the Resnick complaint are Jewish and Unitarian. The defendants in both suits are the Dade County Board of Public Instruction and its individual members.
In both actions, certain individuals, consisting in the main of clergymen and parents of children in the public schools, were permitted by the court to intervene as defendants.
In substance, the complaints allege that, in the public schools, the defendant observes the following practices:
Regular reading of the Bible; comments on the Bible; distribution of sectarian literature to school children; after hours Bible instruction; regular recitation of the Lord's Prayer, grace and other sectarian prayers; singing of religious hymns; religious observance of the Christmas, Hannukka and Easter holidays, including instruction in the dogma of the Nativity and Resurrection; display of religious symbols, baccalaureate programs; conducting a religious census and the use of religious tests for employment and promotion of school employees.
After a prolonged trial and the taking of some 1400 pages of testimony, the chancellor enjoined: Sectarian comments on the Bible by public school teachers; the use of school premises after school hours for Bible instruction; the exhibition of films with religious content and the religious observance in the public schools of Christmas, Easter and Hannukka holidays.
The chancellor rejected the complaints alleging: The reading of the Bible; the distribution of sectarian literature to school children; the recitation of the Lord's Prayer, grace and other sectarian prayers; the singing of religious hymns; the display of religious symbols; baccalaureate programs; the conducting of a religious census and the use of religious tests for employment and promotion of school employees, all upon grounds hereinafter discussed.
The plaintiffs allege that the defendants by their conduct in the public school system of Dade County are in violation of the First and Fourteenth Amendments to the United States Constitution and Sections 5 and 6 of the Declaration of Rights of the Florida Constitution, the pertinent language of which is in the footnote.[1]
*24 The plaintiffs contend that attendance upon or participation in the complained of religious practices is in violation of both the "establishment" and the "free exercise" clauses of the constitutional language above quoted, regardless of whether the alleged practices are sectarian or non-sectarian. Also, notwithstanding the resolution of the Dade County Board of Public Instruction[2] which required the school principal to excuse children from attendance upon request of their parents or guardians, the plaintiffs contend that the exclusion of expert testimony offered for the purpose of showing psychological compulsion and the effects thereof upon the school children was error.
The plaintiffs lean heavily upon the Everson,[3] McCollum,[4] McGowan[5] and Torcaso[6] cases for support and make much of the fact that in those cases, the court, defining the "establishment" clause, used this language:[7]
"Neither a state nor the Federal Government can set up a church. Neither can pass laws which aid one religion, aid all religions, or prefer one religion over another. Neither can force or influence a person to go to or remain away from church against his will or force him to profess a belief or disbelief in any religion. No person can be punished for entertaining or professing religious beliefs or disbeliefs, for church attendance or non-attendance. No tax in any amount, large or small, can be levied to support any religious activities or institutions, whatever they may be called or whatever form they may adopt to teach or practice religion. Neither a state nor the Federal Government can, openly or secretly, participate in the affairs of any religious organizations or groups and vice versa. In the words of Jefferson, the clause against establishment of religion by law was intended to erect `a wall of separation between Church and State.'"
We are not impressed with the language quoted as being definitive of the "establishment" clause. It goes far beyond the purpose and intent of the authors and beyond *25 any reasonable application to the practical facts of every day life in this country. We feel that the broad language quoted must, in the course of time, be further receded from if weight is to be accorded the true purpose of the First Amendment. The quotation imputed to Jefferson, written by him ten years after the adoption of the First Amendment in a letter to the Danbury Baptists of Connecticut,[8] has done little other than cause confusion.
The University of Virginia, wholly controlled by the State of Virginia, by regulation suggested by Mr. Jefferson and adopted by the Visitors of the University provided that the students would be expected to attend religious worship.[9] As was pointed out by Mr. Justice Reed in the McCollum case:[10]
"Thus, the `wall of separation between church and State' that Mr. Jefferson built at the University which he founded did not exclude religious education from that school. The difference between the generality of his statements on the separation of church and state and the specificity of his conclusions on education are considerable. A rule of law should not be drawn from a figure of speech."
It is our view that Cooley more appropriately and accurately states the proposition as follows:[11]
"By establishment of religion is meant the setting up or recognition of a state church, or at least the conferring upon one church of special favors and advantages which are denied to others. It was never intended by the Constitution that the government should be prohibited from recognizing religion * * * where it might be done without drawing any invidious distinctions between different religious beliefs, organizations or sects. The Christian religion was always recognized in the administration of the common law; and so far as that law continues to be the law of the land, the fundamental principles of that religion must continue to be recognized in the same cases and to the same extent as formerly."
If Thomas Jefferson is to be regarded as an authority on the subject, and we concede the point, we believe his opinion, touching the manner in which the Constitution should be construed, expressed in a letter written on June 12, 1823, to William Johnson[12] is more pertinent to the problem before *26 us than is the one quoted above, as taken from the McCollum case:
"On every question of construction, [let us] carry ourselves back to the time when the constitution was adopted, recollect the spirit manifested in the debates, and instead of trying what meaning may be squeezed out of the text, or invented against it, conform to the probable one in which it was passed."
Mr. Justice Jackson in the Zorach[13] case, referring to Mr. Jefferson's "wall", had this to say:
"A number of Justices just short of a majority of the majority that promulgates today's passionate dialectics joined in answering them in Illinois ex rel. McCollum v. Board of Education, 333 U.S. 203, 68 S.Ct. 461, 92 L.Ed. 649, [2 A.L.A.2d 1338]. The distinction attempted between that case and this is trivial, almost to the point of cynicism, magnifying its nonessential details and disparaging compulsion which was the underlying reason for invalidity. A reading of the Court's opinion in that case along with its opinion in this case will show such difference of overtones and undertones as to make clear that the McCollum case has passed like a storm in a teacup. The wall which the Court was professing to erect between Church and State has become even more warped and twisted than I expected. Today's judgment will be more interesting to students of psychology and of the judicial processes than to students of constitutional law." (Emphasis supplied.)
And later, in Saia v. New York[14] in pointing up the confused state of affairs adduced by the several decisions on the question, Mr. Justice Jackson, in his dissent, said:
"* * * Only a few weeks ago we held that the Constitution prohibits a state or municipality from using tax-supported property `to aid religious groups to spread their faith.' People of State of Illinois ex rel. McCollum v. Board of Education, 333 U.S. 203, 68 S.Ct. 461, 464. [92 L.Ed. 648]. Today we say it compels them to let it be used for that purpose. In the one case the public property was appropriated to school uses; today it is public property appropriated and equipped for recreational purposes. * * * And I cannot see how we can read the Constitution one day to forbid and the next day to compel use of a public tax-supported property to help a religious sect spread its faith."
Mr. Justice Desmond, in his concurring Court of Appeals opinion in Zorach v. Clauson,[15] said:
"One of the curiosities of history is the enlarged and distorted meaning currently being given, by some, to the simple phrase of the First Amendment: `an establishment of religion'. It must be the rule as to constitutions, just as to statutes, that there is `no occasion for construction' when the phrasing `is entirely free from ambiguity' * *."
In State v. Butler[16] the Supreme Court of Florida said:
"A Constitution is not to be made to mean one thing at one time and another at some subsequent time, when the circumstances may have so changed as perhaps to make a different rule in the case seem desirable. * * * Where a particular construction has been generally accepted and acted upon, and especially when this has occurred contemporaneously with the adoption of the Constitution, and by *27 those who had opportunity to understand the intention of the instrument, a strong presumption exists that the construction rightly interprets the intention."
In Carden v. Bland[17] the Supreme Court of Tennessee refused to enjoin the reading of the Bible and the singing of religious hymns in the public schools and said:
"In order to wipe out any and all right of the State to control their own system of public education great stress is laid upon the need of maintaining the doctrine of `Separation of Church and State'. We concede that this is important. But it should not be tortured into a meaning that was never intended by the Founders of this Republic, with the result that the public school system of the several states is to be made a Godless institution as a matter of law."
Reviewing the McCollum and Everson cases, the court said:[18]
"As we view these decisions the conclusions reached are irreconcilable."
In Engel v. Vitale[19] the court approved this language:
"`We are a religious people whose institutions presuppose a Supreme Being' * * * As Justice Bedlock of the Appellate Division wrote in this case: `The contention that acknowledgments of and references to Almighty God are acceptable and desirable in all other phases of our public life but not in our public schools is, in my judgment, an attempt to stretch far beyond its breaking point the principle of separation of church and State and to obscure one's vision to the universally accepted tradition that ours is a Nation founded and nurtured upon belief in God'. [11 A.D.2d 340, 206 N.Y.2d 188]"
The United States Supreme Court in Rector, etc., of Holy Trinity Church v. United States,[20] after reviewing many authorities, constitutions and historical documents, held:

"There is no dissonance in these declarations. There is a universal language pervading them all, having one meaning. They affirm and reaffirm that this is a religious nation." (Emphasis supplied)
In the Doremus v. Board of Education[21] case it was said:
"While it is necessary that there be a separation between church and state, it is not necessary that the state should be stripped of religious sentiment * * * Our way of life is on challenge. Organized atheistic society is making a determined drive for supremacy by conquest as well as by infiltration. Recent history has demonstrated that when such a totalitarian power comes into control it exercises a ruthless supremacy over men and ideas, and over such remnants of religious worship as it permits to exist. We are at a crucial hour in which it may behoove our people to conserve all of the elements which have made our land what it is."
The concept of God has been and is so interwoven into every aspect of American institutions that to attack this concept is to threaten the very fiber of our existence as a nation. In Wilkerson v. City of Rome,[22] *28 the Supreme Court of Georgia discussing the background of the doctrine of separation of Church and State in this country stated:
"[U]nder the leadership of Roger Williams of Rhode Island, the movement for the separation of church and state proceeded with ever increasing volume and strength. It should be clearly understood, however, that this was not a movement for the separation of state from Christianity, but specifically a separation of church and state. Christianity entered into the whole warp and woof of our governmental fabric. Many of the statesmen of this country treated Christianity as a part of the law of the land."
By the Declaration of Independence, the Colonies asserted "certain unalienable rights" with which all men were "endowed by their Creator", and appealed "to the Supreme Judge of the world for the rectitude of our intentions." After the Revolution, the treaty exacted from Great Britain begins with these words:[23] "In the name of the Most Holy and Undivided Trinity." In the light of these historic facts, can it be said that reference to the Scriptures or recognition of the Deity in our public schools is in violation of the constitutional rights of any person?
We think it significant that the federal government, in keeping with our traditional public recognition of religion and in harmony with Cooley's construction of the "establishment" clause has: Provided chaplains for both Houses of Congress who daily invoke Divine blessings upon the meetings; commissioned chaplains for the Armed Forces who employ for religious purposes property belonging to the United States but dedicated to the cause of religions; approved the opening exercises of the public schools in the District of Columbia, a creature of the federal government, which exercises include a reading from the Bible and the Lord's Prayer; approved the requirement by the United States Naval and Military Academies of compulsory attendance of the Cadets at Sunday church services, presided over by chaplains paid by the United States Government and held in property owned by the government; authorized the flying of the church flag above or to the right of the national flag during church services conducted at sea by navy chaplains; required the President and Members of Congress, the Justices of the United States Supreme Court to subscribe to an oath in which the aid of Deity is invoked; inscribed the words "In God We Trust" upon the currency of the nation; designated a national anthem which proclaims the Deity; approved, along with the several states, the exemption of multiplied millions of dollars worth of church property from taxation.
In countless other instances the federal government accepts religion as an ever present fact without suggesting violation of the "establishment" and "free exercise" clauses which, we believe, have been tortured beyond the intent of the Authors.
It seems to us that Cooley, acclaimed as the foremost authority on the Constitution as it was in his time, by avoidance of gymnastic semanticisms and by the application of authentic definitions to simple words has fairly approximated the intended purposes of the constitutional safeguards.[24]
*29 It is beyond the realm of possibility for this court to reconcile our conception of the First Amendment with the too broad language of the several decisions relied upon by the plaintiff. Nor have we been able to reconcile the several retreats, modifications and hair-splitting distinctions written in those opinions and made to accommodate varying statements of facts. We, therefore, adopt for our guidance, Cooley's definition of the "establishment" clause as quoted above and, in doing so, we are mindful of the rule laid down and stated many times by the Supreme Court of the United States:[25]
"* * * [T]he public interests imperatively demand  that legislative enactment be recognized and enforced by the courts as embodying the will of the people, unless they are plainly and palpably, beyond all question, in violation of the fundamental law of the Constitution." (Emphasis ours.)
The plaintiffs insist that each of the challenged practices violates not only the "establishment" but, also, the "free exercise" clause. For the purposes of immediate consideration we find that compulsion is essential to a violation of the "establishment of religion" clause, and that, as to the facts before us, it is not necessary that the "establishment" and "free exercise" guarantees be treated separately. If the offenses complained of conflicts with the safeguards provided by the Constitution, it must be because there is present compulsion requiring unwilling support of religion, in whatever its form.
Justice Meyer in the Engel[26] case, discussing compulsion, used this pertinent language:
"* * * In any event, to the extent that petitioners seek to rely on the pressure resulting from the school's apparent sanction of prayer and from the necessity of applying for release from the exercise, as distinct from overt acts of the teachers or other school authorities, the evidence would not be material. To recognize `subtle pressures' as compulsion under the Amendment is to stray far afield from the operations the Amendment was designed to prevent * * *."
"* * * [D]ivisiveness and consciousness of religious differences have not been raised to the level of constitutional absolutes. * * *"
In this case the basic facts are that Florida Statute, § 231.09., F.S.A.,[27] requires *30 the daily reading of the Bible without sectarian comment. Moreover, the record shows that by appropriate regulation the Dade County Board of Public Instruction requires that pupils be excused from attendance upon request by the parents or guardians. Our problem is to determine whether the practices complained of violate the constitutional safeguards. If the facts constitute "establishment" of religion or restriction of the free exercise thereof it must be because there is compulsion. If the pupils are compelled to attend upon the practices cited, or if their free exercise of religion is otherwise circumscribed, then we must conclude there is a violation of the "establishment" and "free exercise" safeguards.
We think it necessary that, unless otherwise clearly commanded by the plain language of the statutes of the Constitution, the courts refrain from purely philosophical invasions of the Constitution or long established and accepted customs of the vast majority of the American people. The recurrent whittling away of the bedrock foundations of our society can be nothing short of destructive of free government. Every doubtful judicial withdrawal of the sovereignty of the states or the traditional freedoms of the people weakens the fabric of the nation and the confidence of its citizens. If the Constitution be wrong it should be corrected by amendment and not judicial usurpation.[28]
As was stated by the Circuit Court of Appeals opinion in the Zorach case:[29]
"One of the curiosities of history is the enlarged and distorted meaning currently being given, by some, to the simple phrase of the First Amendment: `an establishment of religion'. It must be the rule as to constitutions, just as to statutes, that there `is no occasion for construction' when the phrasing `is entirely free from ambiguity', Wright v. United States, 302 U.S. 583, 589, 58 S.Ct. 395, 397, 82 L.Ed. 439; * * *. The language of a constitution is to be given its ordinary meaning. Wright v. United States and Carey v. Morton, supra [297 N.Y. 361, 79 N.E.2d 442]. The fundamental purpose in construing it is to ascertain and give effect to the intent of the framers and of the people who adopted it, keeping in mind the object sought to be accomplished and the evils sought *31 to be prevented or remedied. Under any and all of those rules and tests (and they are all one), what is the meaning of `an establishment of religion'? The Supreme Court itself gave us the answer in Cantwell v. Connecticut, 310 U.S. 296, 303, 60 S.Ct. 900, 903, 84 L.Ed. 1213: `it forestalls compulsion by law of the acceptance of any creed or the practice of any form of worship.' `Established' churches were well known to the colonists, who had experienced them in Europe and America. They knew that the phrase meant `a state church, such as for instance existed in Massachusetts for more than forty years after the adoption of the Constitution', Corwin, Constitution and What It Means Today [9th ed.] pp. 155-156."
It is of interest here that the United States Supreme Court decision in the Zorach case makes it clear that the First Amendment does not say there must be in every and all respects a separation of church and state.[30] Rather the First Amendment defines the manner and specific way in which there shall be no concert, or union, or dependency, one on the other. The court held that to be "the common sense of the matter" and that, otherwise, the state and religion would be aliens to each other  hostile, suspicious, and even unfriendly; that prayers in our Legislative Halls; appeals to the Almighty by the Chief Executives; the words "So Help Me God" in our courtroom oaths; the supplication with which the Supreme Court of the United States opens each session, "God save the United States and this Honorable Court," could be held objectionable.[31]
In the light of this reasoning in the Zorach case the court held that the public schools of New York City, upon written request of the parents, were permitted to release, during the school day, those students who wished to attend religious exercises held outside the school building. The court found that it was proper that the school board assemble the students upon school property and, during the school day, excuse them from attendance upon classes of regular and secular instruction by teachers and in classrooms provided at public expense. The time of the teachers and the use of the classrooms, the utilities and conveniences, made available at public expense, were not, in the absence of such released students, put to use and represented, in actual fact, albeit by indirection, public tax funds expended in aid of religion. But the infringement was thought by the court to be inconsequential and therefore permitted under the Constitution.
In principle there is no substantial difference between the excusing of the Zorach students who wished to attend religious exercises elsewhere and the excusing of the Dade County students who do not wish to hear the Bible read in school. And, in substance, there is no difference in principle between the three and five minutes' use of Dade County public school facilities for the reading of the Bible to those who wish to hear it and the non-use, during school hours, of such facilities in Zorach while those who wish religious instruction elsewhere are excused from the premises. To beg the question between the facts in Zorach and the instant case is to engage in cynical trivialities.
It does not appear by the pleadings and testimony that there is any serious contention that the children of the plaintiffs have suffered or will suffer any measurable psychological trauma as a consequence of the reading of the Bible, either in or out of their presence. Rather, it seems that this is just another case in which the tender sensibilities of certain minorities are sought to be protected against the allegedly harsh laws and customs enacted and established *32 by the more rugged pioneers of the Nation. In the instant case we are told that the primary objects of solicitude are the children of the plaintiffs, atheists, Unitarians and Jews, which children, although not required to be present at the time, will, so it is said, suffer some supposedly irreparable emotional stress if their classmates are permitted to hear the Bible read. It seems more likely that the children in question are the unwitting victims of a quasi-political contest.
The plaintiffs assume, inferentially at least, that minorities enjoy a peculiar susceptibility to psychological and emotional trauma and compulsions and are entitled to some peculiar and fatherly protection against the strange ways of the ordinary American citizen. But such is not the case. The minority is entitled to enjoy the same privileges and the same justice as are enjoyed by people generally as an inherent right. The minority and the majority are both denied the privilege of disrupting the lives of others because of some hyper-sensitivity or fractious temperament.[32]
To say that the vast majority of students in the Dade County public school system are to be foreclosed of the privilege of living a few moments each day with the words of the Bible, the greatest of all literature, or of observing in the classroom, if such were possible, the magnificent painting of the Last Supper, or of listening to Caruso's recording of Adeste Fidelis, because a minority might suffer some imagined and nebulous confusion, is to approach the ridiculous.
We believe it necessary that public education give due recognition to the place of religion and the culture and convictions of our people but that in doing so the principle of separation of church and state must be safeguarded. The road is a difficult one but, certainly, we cannot agree that banishing the Bible and music and paintings of religious connotation will benefit the plaintiffs' children in any material way. We are of the opinion that erasing the influence of the best literature, music and art and gentler aspects of American life in general would be to create an anti-religious attitude in the schools and substantially injure the well being of the majority of the school children. And although it may be urged that to take such drastic action is to incur the good will of the nation's enemy we think the cost too great and the proposal ill-founded in law.
We are sensible of the extent to which the sophistries of agnosticism have gained credence. And we acknowledge the trend toward the preference of minorities over the majority and toward the requiring of the majority, which seem never to suffer psychological trauma, to yield up its cherished customs and rights. Although we concede the duty to turn the other cheek to the enemy and to deal gently with the weak, we do not agree that it is our function to subvert the purpose and intent of the Constitution to those ends, nor do we *33 feel impelled to indulge in flights of fanciful philosophy. When we subscribed to our official oaths it was with "no mental reservations and with no purpose to construe the Constitution by any hypercritical rules."[33]
For all practical purposes there are now in the world just two forms of government, loosely denominated Democracy and Communism. The vital difference between the two is that the Democracies accept religion and guarantee its free exercise, in one form or another, as part of the day to day lives of their people, whereas Communism has banished religion, except as it may be bootlegged in the dark and inhospitable corners. A consequential distinction, as the major difference is applied to these United States, is that here we prohibit the governmental establishment of religion but guarantee to all the free exercise thereof while, under Communism, religion is denied and those who profess religion are hounded underground.
We feel it equally imperative that we preserve the safeguards of the Constitution against all violations of the "establishment" and "free exercise" clauses and, at the same time, preserve those clauses and the rights of the States and the people thereunder against weasel-worded constructions and distinctions designed to impute to them either more or less than was originally intended. But typical of the American custom of meeting the other side more than half way, is the paradox of the appellee school board insuring the free exercise of religion while, by mandatory statute,[34] it must teach the history, doctrines, objectives and techniques of Communism. Thus the school board affords the atheists the freedom of hearing or not hearing the Bible read while it requires that all students, without choice, be taught the facts of Communism, the antithesis of the Bible.
In the Everson case,[35] the courts held it should not strike the New Jersey statute if it is within the state's constitutional power, even though it approaches the verge of that power. The statute there in question was one which authorized the State of New Jersey to pay from public funds the cost of transporting students to parochial schools. It was held not in violation of the "establishment of religion" clause.
The court sustained its reasoning by its understanding of the meaning of the language written into the Bill of Rights as reflected by its review of the background and environment of the period in which such language was fashioned and adopted. In that review, it was found that early settlers of this country came here from Europe to escape the bondage of laws which compelled them to support government favored churches at a time filled with turmoil, civil strife, and persecution, generated in large part by established sects determined to maintain their absolute political and religious supremacy. It was shown that Catholics persecuted Protestants, Protestants had persecuted Catholics, Protestant sects had persecuted other Protestant sects, Catholics of one shade of belief had persecuted Catholics of another shade of belief, and all these had from time to time persecuted Jews; that whatever religious group happened at the moment to be in league with the government had contributed to the fining, the casting in jail, the torturing and killing of men and women. Dissenters were compelled to pay tithes and taxes to support government-sponsored churches whose ministers preached inflammatory sermons designed to strengthen and consolidate the established faith; that such practices became so commonplace as to shock the freedom loving colonials into a feeling of abhorrence. The imposition of taxes to pay ministers' salaries and to build and maintain churches aroused indignation. *34 It was these feelings which found expression in the First Amendment.[36]
The court, in the Everson case,[37] quoted with approval the language of Watson v. Jones:[38]
"The structure of our government has, for the preservation of civil liberty, rescued the temporal institutions from religious interference. On the other hand it has secured religious liberty from the invasion of civil authority."
The court held that, notwithstanding the First Amendment, New Jersey could spend tax raised funds to pay the bus fares of parochial school pupils as a part of a general program under which it pays the fares of pupils attending public and other schools. It was obvious that such payments materially helped children to get to church schools and, equally obvious, there was the possibility that some of such children might not be sent to church schools if the parents were compelled to pay the cost of transportation. The court agreed that the First Amendment requires the state to be neutral in its relations with groups of religious believers and non-believers, but that it does not require the state to be their adversary. It was held that, although the First Amendment has erected a wall between church and state, the New Jersey act did not breach that wall.
An examination of the Everson, Zorach and McCollum cases.[39] convinces us of the practical impossibility of drawing distinctions between nebulosities. The purpose of the First Amendment was to prevent the abuses prevalent prior to and at the time of its adoption. There is no occasion to strain at gnats in the cause under consideration. There is or there is not a violation of the substantial meaning of the "establishment" clause and the "free exercise" clause. We see no profit in a tweedledee, tweedle-dum uncertainty in which the complete and uncompromising separation of church from state is argued but the exception is allowed, nor the sort of indecisiveness thought by Justice Jackson[40] to be best typified by Byron's Julia who "whispering `I will ne'er consent,'  consented."[41]
The reasoning in the McCollum case does not convince us there was error in the chancellor's findings here. There, the local Board of Education approved the giving of religious instruction in the schools under a "released time" arrangement pursuant to which outside teachers furnished by a religious council conducted the classes. The court held the arrangement to be in violation of the constitutional separation of church and state. Mr. Justice Jackson, concurring in the majority opinion,[42] questioned whether the circumstances of the case established jurisdiction in the Supreme Court, maintaining that jurisdiction was not conferred by the fact that the complaining child was humiliated by not joining others in attendance upon such classes and holding *35 that, although the Constitution protects the right to dissent, it cannot be construed to protect one from embarrassment which attends non-conformity, whether in religion, politics, behavior or dress; that since no legal compulsion was applied to the complainant's son himself and no penalty was imposed or threatened from which the court might relieve him, jurisdiction could not be based upon that ground.
Mr. Justice Jackson also pointed to the fact that the cost of the plan complained of was incalculable and negligible, neither substantial nor measurable; that if we are to eliminate everything that is objectionable to any of these warring sects or inconsistent with any of their doctrines, we will leave public education in shreds; that nothing but educational confusion and a discrediting of the public school system can result from subjecting it to constant lawsuits; that it would not seem practical to teach either practice or appreciation of the arts if we are to forbid the exposure of youth to any religious influences. Music without sacred music, architecture without the cathedrals, or paintings without the Scriptural themes would be eccentric and incomplete, even from a secular point of view; that, "one can hardly respect a system of education that would leave the student wholly ignorant of the occurrence of religious thought that moved the world society for a part in which he is being prepared."[43] The facts, the reasoning and the findings of the McCollum case, convince us of the need to establish limitations beyond which cavilling and nit-picking complaints will not be considered. Those limitations must be drawn in broad and substantial lines which eliminate fine distinctions, hyper-sensitivities and questionable jurisdictional fact.
The intervening appellees, by their cross appeal, purported to raise for this Court's consideration the correctness of the chancellor's decree enjoining certain activities. In view of the fact that the school board, by not filing a cross appeal, has acceded to and indicated its willingness to comply with that portion of the chancellor's decree, we find it unnecessary that we consider the point raised by the intervening appellees.
We have thus far limited our treatment of the merits of this cause to what we conceive to be the pivotal issue herein, the constitutionality of the statute requiring daily readings from the Holy Bible. The appellants have raised, and we have considered, a number of points relating to other religious practices allegedly being carried on in the public schools of Dade County, which the chancellor refused to enjoin.
It is our opinion that the legal issues raised in connection with these other points have been disposed of adequately by the foregoing consideration of the Bible readings. The principles governing the recitation of the Lord's Prayer, the singing of religious hymns and the holding of baccalaureate programs are much the same as those applicable to the reading of the Bible. It is our conclusion that such practices of the appellee school board are so conducted as not to infringe the constitutional safeguards enjoyed by appellants.
The appellants' prayer to enjoin the display of religious symbols in the schools was denied by the chancellor "* * * upon the ground that the religious displays were found by this court to be works of art created by the school children and were displayed on a temporary basis and not of a permanent nature." It is our opinion that this holding of the chancellor is well grounded both in fact and in law. This issue, moreover, serves to point up the delicate balance of rights involved in a case of this nature. Are school children to be forbidden from expressing their natural artistic talents through media including religious themes? Or, are the results of their efforts to be excluded from public *36 display and recognition merely because they choose to adopt a religious, rather than a secular subject? The answer should be obvious. To impose such a restriction would more nearly approach a restraint upon the free exercise of religion than does the present practice of the school board in permitting such displays.
The chancellor found that there was no factual basis for the appellants' allegations regarding a religious census of school children and religious tests for teachers. His findings in this regard are adequately supported by competent substantial evidence and therefore merit no further discussion here.
For the foregoing reasons the decree of the chancellor should be and it is hereby affirmed.
ROBERTS, C.J., and TERRELL, THOMAS, DREW, THORNAL and O'CONNELL, JJ., concur.
NOTES
[1] The First Amendment to the United States Constitution provides in part:

"Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof * * *."
The Fourteenth Amendment to the United States Constitution provides in part:
"No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws." Section 5 (in part) and Section 6 of the Declaration of Rights of the Florida Constitution provide as follows:
"Section 5. Religious freedom; liberty of conscience, etc. The free exercise and enjoyment of religious profession and worship shall for-ever be allowed in this State * * *."
"Section 6. Religious preferences; public aid, etc. No preference shall be given by law to any church, sect or mode of worship and no money shall ever be taken from the public treasury directly or indirectly in aid of any church, sect or religious denomination or in aid of any sectarian institution."
[2] "1. That the Bible be read daily without sectarian comment in each of the schools in the Dade County System.

"2. Any pupil shall be excused from such Bible reading, or attending such Bible reading, upon the written request of his parent, or guardian.
"3. If any non-academic activity in the schools be deemed by parent or guardian to be violative of the religious conscience of such parent, or guardian, of any child in the public school system, that such parent, or guardian shall have the right to request the release of his child from participating therein, and the various principals shall grant such request, making proper provision for the orderly care of such released children." (Resolution 60-21, adopted June 29, 1960.)
[3] Everson v. Board of Education, 330 U.S. 1, 67 S.Ct. 504, 91 L.Ed. 711 (1946).
[4] People ex rel. McCollum v. Board of Education, 333 U.S. 203, 68 S.Ct. 461, 92 L.Ed. 649 (1948).
[5] McGowan v. Maryland, 366 U.S. 420, 81 S.Ct. 1101, 6 L.Ed.2d 393 (1961).
[6] Torcaso v. Watkins, 367 U.S. 488, 81 S.Ct. 1680, 6 L.Ed.2d 982 (1961).
[7] Everson v. Board of Education, 330 U.S. 1, 15-16, 67 S.Ct. 504, 511, 91 L.Ed. 711, 723 (1946); People ex rel. McCollum v. Board of Education, 333 U.S. 203, 210-211, 68 S.Ct. 461, 464, 92 L.Ed. 649, 658 (1948); McGowan v. Maryland, 366 U.S. 420, 443, 81 S.Ct. 1101, 1114, 6 L.Ed.2d 393, 409 (1961); Torcaso v. Watkins, 367 U.S. 488, 493, 81 S.Ct. 1680, 1682, 6 L.Ed.2d 982, 986 (1961).
[8] Reply to Greetings from Committee of the Danbury Baptist Ass'n of Connecticut, January 1, 1802; see Reynolds v. U.S., 98 U.S. 145, 164, 25 L.Ed. 244, 249 (1878):

"Believing with you that religion is a matter which lies solely between man and his God; that he owes account to none other for his faith or his worship; that the legislative powers of the Government reach actions only, and not opinions, I contemplate with Sovereign reverence that act of the whole American people which declared that their Legislature should `make no law respecting an establishment of religions or prohibiting the free exercise thereof', thus building a wall of separation between Church and State."
[9] C, II, § 1 of the Regulations of the University of October 4, 1824:

"Should the religious sects of this State, or any of them, according to the invitation held out to them, establish within, or adjacent to, the precincts of the University, schools of instruction in the religion of their sect, the students of the University will be free, and expected to attend religious worship at the establishment of their respective sects, in the morning, and in time to meet their School in the University at its stated hour."
See, Randall, Life of Thomas Jefferson, Vol. 3, p. 470 (1858).
[10] Illinois ex rel. McCollum v. Board of Education, 333 U.S. 203, 247, 68 S.Ct. 461, 482, 92 L.Ed. 649, 677 (1947).
[11] Cooley, Principles of Constitutional Law, 213-214 (2nd ed. 1891).
[12] Ford, The Writings of Thomas Jefferson, Vol. 10, p. 231 (1899).
[13] Zorach v. Clauson, 343 U.S. 306, 325, 72 S.Ct. 679, 689, 96 L.Ed. 954, 968 (1951).
[14] 334 U.S. 558, 569-570, 68 S.Ct. 1148, 1154, 92 L.Ed. 1574, 1582 (1947).
[15] 303 N.Y. 161, 179, 100 N.E.2d 463, 472 (1951).
[16] 70 Fla. 102, 134, 69 So. 771, 780 (1915).
[17] 199 Tenn. 665, 678, 288 S.W.2d 718, 724 (1956).
[18] Ibid.
[19] 10 N.Y.2d 174, 178, 218 N.Y.S.2d 659, 661, 176 N.E.2d 579, 581 (1961).
[20] 143 U.S. 457, 470, 12 S.Ct. 511, 516, 36 L.Ed. 226, 231 (1891).
[21] 5 N.J. 435, 451-452, 75 A.2d 880, 888 (1950), App. dismissed 342 U.S. 429, 72 S.Ct. 394, 96 L.Ed. 475 (1951).
[22] 152 Ga. 762, 769, 110 S.E. 895, 899, 20 A.L.R. 1334 (1922).
[23] Definitive Treaty of Peace with His Britannic Majesty, Sept. 3, 1783, 8 Stat. 80. Public Treaties of U.S. in force on December 1, 1873, 18 Stat. 266 (1875).
[24] See footnote 11, supra; see also, Schofield, Constitutional Law and Equity, Vol. 2, pp. 460-465 (1921); Story, The Constitution, Vol. 2, pp. 630-631 (5th ed. 1891):

"Probably at the time of the adoption of the Constitution, and of the amendment to it now under consideration, the general if not the universal sentiment in America was, that Christianity ought to receive encouragement from the state so far as was not incompatible with the private rights of conscience and the freedom of religious worship. An attempt to level all religions, and to make it a matter of state policy to hold all in utter indifference, would have created universal disapprobation, if not universal indignation. * * * But the duty of supporting religion, and especially the Christian religion, is very different from the right to force the consciences of other men or to punish them for worshipping God in the manner which they believe their accountability to him requires * * *."
[25] Atkin v. Kansas, 191 U.S. 207, 223, 24 S.Ct. 124, 48 L.Ed. 148, 158 (1903).
[26] Engel v. Vitale, 18 Misc.2d 659, 191 N.Y.S.2d 453, 491-492, 493 (1959), aff'd 10 N.Y.2d 174, 218 N.Y.S.2d 659, 176 N.E.2d 579 (1961).
[27] Florida Statute, Section 231.09, F.S.A. (1961):

"Duties of instructional personnel.  Members of the instructional staff of the public schools, subject to the rules and regulations of the state board and of the county board, shall perform the following functions:
"(1) Teaching.  Teach efficiently and faithfully using the books and materials required, following the prescribed courses of study, and employing approved methods of instruction, the following: the essentials of the United States constitution, flag education, including proper flag display and flag salute, the elements of civil government, the elementary principles of agriculture, the true effects of all alcoholic and intoxicating liquors and beverages and narcotics upon the human body and mind, kindness to animals, the history of the state, conservation of natural resources, and such additional materials, subjects, courses, or fields in such grades as may be prescribed by law or by regulations of the state board and county board in fulfilling the requirements of law; provided, that state and county officials shall furnish and put into execution a system and method of teaching the true effects of alcohol and narcotics on the human body and mind, provide the necessary textbooks, literature, equipment, and directions, see that such subjects are efficiently taught by means of pictures, charts, oral instruction, and lectures and other approved methods, and require such reports as are deemed necessary to show the work which is being covered and the results being accomplished, and provided further, that any child whose parent shall present to the school principal a signed statement that the teaching of disease, its symptoms, development and treatment, and the viewing of pictures or motion pictures of such subjects conflict with the religious teachings of their church, shall be exempt from such instruction, and no child so exempt shall be penalized by reason of such exemption.
"(2) Bible reading.  Have, once every school day, readings in the presence of the pupils from the Holy Bible, without sectarian comment.
"(3) * * *."
[28] Washington's Farewell Address, September 16, 1796:

"The spirit of encroachment tends to consolidate the powers of all the departments in one, and thus to create, whatever the form of government, a real despotism. * * * If in the opinion of the people the distribution or modification of the constitutional powers be in any particular wrong, let it be corrected by an amendment in the way which the Constitution designates. But let there be no change by usurpation; for though this in one instance may be the instrument of good, it is the customary weapon by which free governments are destroyed."
[29] Zorach v. Clauson, 303 N.Y. 161, 179, 100 N.E.2d 463, 472 (1951).
[30] Zorach v. Clauson, 343 U.S. 306, 312, 72 S.Ct. 679, 683, 96 L.Ed. 954, 961 (1951).
[31] Ibid.
[32] See Engel v. Vitale, 18 Misc.2d 659, 191 N.Y.S.2d 453, 487 (1959), aff'd 10 N.Y.2d 174, 218 N.Y.S.2d 659, 176 N.E.2d 579 (1961):

"Every individual has a constitutional right personally to be free from religion, but that right is a shield, not a sword, and may not be used to compel others to adopt the same attitude."
Doremus v. Board of Education, 5 N.J. 435, 451, 75 A.2d 880, 887 (1950) app. dismissed 342 U.S. 429, 72 S.Ct. 394, 96 L.Ed. 475 (1951):
"Again, take the instance of an atheist:  he has all the protection of the constitution; he may not be held to any religious function or to the support, financial or otherwise, of a religious establishment; he may entertain his belief or the lack of belief as he will; but he lives in a country where theism is in the warp and woof of the social and the governmental fabric and he has no authority to eradicate from governmental activities every vestige of the existence of God. He could not, we hypothesize, prevent, on constitutional grounds, the houses of Congress from opening their sessions with prayer to the Almighty for guidance in their deliberations, even though he were a member of Congress * * *".
[33] Lincoln, First Inaugural Address, March 4, 1861.
[34] Florida Statute, § 230.23(4) (l), F.S.A. (1961).
[35] Everson v. Board of Education, 330 U.S. 1, 67 S.Ct. 504, 91 L.Ed. 711 (1946).
[36] Story, The Constitution, Vol. 2, pp. 631-632 (5th ed. 1841):

"The real object of the amendment was * * * to prevent any national ecclesiastical establishment which should give to a hierarchy the exclusive patronage of the national government. It thus cuts off the means of religious persecution (the vice and pest of former ages), and of the subversion of the rights of conscience in matters of religion, which had been trampled upon almost from the days of the Apostles to the present age."
[37] Id. at 15, 67 S.Ct. at 511, 91 L.Ed. at 723.
[38] 80 U.S. (13 Wall.) 679, 730, 20 L.Ed. 666, 677 (1812).
[39] Footnote 7, supra.
[40] Everson v. Board of Education, 330 U.S. 1, 19, 67 S.Ct. 504, 513, 91 L.Ed. 711, 725 (1946).
[41] Byron, Don Juan. Canto i, st. 117.
[42] People ex rel. McCollum v. Board of Education, 333 U.S. 203, 232, 68 S.Ct. 461, 475, 92 L.Ed. 649, 669 (1948).
[43] Id. at 236, 68 S.Ct. at 477, 92 L.Ed. at 671.